232 P.3d 1104 (2010)
In the Matter of the WELFARE OF A.B., a minor child.
Rogelio Salas, Appellant,
v.
The Department of Social and Health Services, Respondent.
No. 80759-1.
Supreme Court of Washington, En Banc.
Argued June 24, 2008.
Decided June 10, 2010.
*1105 Susan F. Wilk, David L. Donnan, Washington Appellate Project, Seattle, WA, for Petitioner.
Sheila Malloy Huber, Attorney at Law, Olympia, WA, Michael James Shinn, Office of the Atty. General, Miriam Rosenbaum, Attorney General of Washington, Vancouver, WA, for Respondent.
Linda Lillevik, Carey & Lillevik PLLC, Seattle, WA, Amicus Curiae on behalf of Washington Defender Association.
MORGAN, J.[*]
¶ 1 The trial court granted the State's petition to terminate the parent-child relationship between Rogelio Salas and his daughter, A.B. The Court of Appeals affirmed by unpublished opinion. In re Welfare of A.B., 140 Wash.App. 1024 (2007). We granted Salas' motion for discretionary review. In re Dependency of A.L.S.B., 164 Wash.2d 1001, 192 P.3d 368 (2008). Salas now argues (1) that he has a due process right not to have his relationship with his natural child terminated unless the trial court first finds that he, at the time of trial, is currently unfit to be a parent, (2) that the trial court in his case did not make such a finding, and thus (3) that the trial court's order terminating his relationship with his daughter violated his right to due process. The State responds to the second of these propositions by asking us to imply such a finding if none was expressed and by claiming *1106 that the record in this case contains evidence sufficient to support the trial court's findings. In addition, Salas argues that the trial court misapplied the six termination factors of RCW 13.34.180(1) by mixing considerations involving A.B.'s best interests and considerations involving his parental rights. Holding that Salas is correct on both scores and rejecting the State's responses, we reverse and remand for further proceedings consistent herewith.
¶ 2 By virtue of RCW 13.34.180(1) and RCW 13.34.190, a Washington court uses a two-step process when deciding whether to terminate the right of a parent to relate to his or her natural child. The first step focuses on the adequacy of the parents[1] and must be proved by clear, cogent, and convincing evidence.[2] The second step focuses on the child's best interests[3] and need be proved by only a preponderance of the evidence.[4] Only if the first step is satisfied may the court reach the second.[5]
¶ 3 According to RCW 13.34.180(1), the first step involves six termination factors, each of which must be proved clearly, cogently, and convincingly. They are
(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the future ....; [and]
(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.
RCW 13.34.180(1). According to RCW 13.34.190, the second step is for the court to ascertain the best interests of the child. Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence.
¶ 4 With this statutory scheme in mind, we turn to the facts here. On October 27, 2001, A.B. was born at a hospital in Yakima, Washington. The hospital quickly discovered that A.B. had cocaine in her system, deduced that her mother, J.B., had been abusing that drug, and notified the Washington State Department of Social and Health Services (DSHS).
¶ 5 On October 29, 2001, DSHS took custody of A.B. and placed her temporarily in a licensed foster home. Soon thereafter, DSHS commenced dependency proceedings and promptly notified Salas, whom J.B. had named as A.B.'s father. J.B.'s parental rights were later terminated, and she is not a party to this appeal. Salas' paternity of A.B. was confirmed on June 25, 2002.
¶ 6 Never married to J.B., Salas was living in Las Vegas, Nevada, at the time A.B. was born. Due to his own prior drug abuse, he was being supervised by a Nevada drug court and was prohibited from leaving Nevada. As a result, he initially was unable to attend the Yakima dependency hearings in *1107 person, although appeared and participated through court-appointed counsel.
¶ 7 According to the trial court's written findings of fact, Salas last abused drugs in late 2001. Around that same time, Salas and his mother asked DSHS to arrange for a Nevada home study, in the hope that A.B. could be placed in the home that Salas, his mother, and her husband (Salas' stepfather) were then sharing. Nevada declined, citing his criminal history and the fact that his paternity had not yet been confirmed.
¶ 8 On February 4, 2002, the trial court entered an order finding that A.B. was dependent. It also ruled that Salas could visit A.B. so long as he did so in Yakima. About the same time, DSHS removed A.B. from the foster home where she had been living since late October and placed her in the home of T.L., a distant cousin of J.B.'s. A.B. has resided with T.L. ever since.
¶ 9 While these events were taking place, Salas continued to participate in the Nevada drug court program, and he found steady employment in Las Vegas. Shortly after his paternity was confirmed, he reiterated his request for a Nevada home study. Nevada again denied the request, this time citing his criminal history and prior drug use.
¶ 10 By February 25, 2003, Salas had successfully completed his drug court program and was no longer prohibited from leaving Nevada. On that date, he came to Yakima and had his first supervised visit with A.B., who by then was almost 16 months old.
¶ 11 On June 11, 2003, Salas moved from Las Vegas to Yakima. On June 13, two days later, he presented himself to the DSHS caseworker, and she arranged for urinalyses, a parenting assessment, and supervised visits three times a week for an hour each time. That same month, Salas began visiting A.B. regularly and frequently, albeit under supervision.
¶ 12 Visitation progressed so well over the summer that by September 2003, the DSHS caseworker thought that A.B. had come to see Salas as "someone who was in her life consistently ... [a]nd so she began to trust."[6] At a September meeting called to plan where A.B. should be permanently placed, the caseworker noted that she was planning to arrange increased visitation without supervision, and that she was moving toward placing A.B. in Salas' home, despite T.L.'s apparent opposition.
¶ 13 On September 16, 2003, Salas' first unsupervised visitation was scheduled to take place at a Yakima park. The caseworker and A.B. were there on time, but Salas never arrived. An hour after the appointed time, Salas' stepfather called to say that Salas was in jail for pushing a police officer who had tried to intervene in a fight between Salas and his then-girlfriend, C.S.
¶ 14 Due in part to an immigration hold, Salas remained in jail for the next four months. During that period, he did not see A.B., and the DSHS caseworker changed her permanent plan from one that would have reunited A.B. and Salas, to one that would terminate their parent-child relationship and make A.B. available for adoption by T.L.
¶ 15 Visitation resumed in January 2004, but it was different from before. A.B. seemed not to recognize Salas, and she treated him like a stranger. Rather than showing any sort of attachment to Salas, one observer noted, A.B. constantly turned to T.L., who was also present at the visitations. According to the April 2003 report of another observer, A.B. seemed not to want to leave T.L.'s side during the visitations. At trial, the DSHS caseworker explained that four and a half months can be a very long time to a child of A.B.'s age, and that A.B.'s reluctance to interact with Salas was likely due to the gap between visits that had occurred while Salas was in jail. Nonetheless, Salas visited A.B. every week from February 2004 through most of February 2005.
¶ 16 Meanwhile, in May 2004, Salas married C.S., the girlfriend with whom he had been fighting the previous September. Their relationship was "dysfunctional and unhealthy,"[7] and they separated in July 2004, after only three months of marriage.
*1108 ¶ 7 On January 1, 2005, C.S. gave birth to Salas' child, A.S. When C.S. left the hospital, the heat at her house was turned off, and she had nowhere to go. Consequently, Salas allowed her and the three persons living with her (A.S., the new baby; G.S., C.S.'s older child from another relationship; and C.S.'s disabled adult sister) to move in with him. In February 2005, C.S. was convicted for criminally mistreating her disabled sister an event of which Salas disclaims all knowledge, and for which he was never charged.
¶ 18 In late February 2005, Salas moved back to Las Vegas, where he resumed living with his mother and stepfather and working at the steady job he previously had held. His mother and stepfather having been made guardians of A.S., the baby born on January 1, 2005, and Salas having received custody of G.S., C.S.'s older child from another relationship, by virtue of a tribal court order, the five of them, three adults and two children, have since resided together in the home of his mother and stepfather.
¶ 19 Although Salas visited A.B. regularly from February 2004 until February 2005, his return to Las Vegas caused him to miss a visitation that was scheduled for February 25, 2005. He next saw A.B. in May, when he called the DSHS caseworker and requested weekend visitation because he would now have to travel from Las Vegas. When the caseworker told him that weekend visits were not available, they agreed that Salas and A.B. would visit on Friday afternoon, May 20, 2004. Although the visit took place as scheduled, A.B. continued to refuse to interact with him, and he did not visit again before trial.
¶ 20 On June 13-17, 2005, a bench trial was held on a petition for termination that the State had filed in September 2004. On June 17, 2005, the trial court exercised its discretion not to resolve the case at that time. The court orally stated that it was "not satisfied that all necessary services have been identified and provided,"[8] and that there "is some likelihood that conditions can be remedied, so that this father can continue to be involved in this child's life."[9] The court decided that it would continue the trial so as to give Salas time "to convince me that I should not terminate the relationship with this child. And the way you can do that is by coming up with some plan. I want it in writing, and I want some evidence between now and then that's not just on paper."[10] Cautioning Salas not to "heave a sigh of relief, yet," the court stated that A.B. "is ok" at T.L.'s house, and that "it's going to take an unbelievable effort for you to dislodge [her] from that home."[11]
¶ 21 From mid-June until trial reconvened in November, Salas attempted to meet the trial court's concerns. He visited A.B. every two weeks. He obtained a new domestic violence evaluation in Las Vegas and began a new 26-week domestic violence treatment program. On August 4, 2005, he presented the court with a plan for continuing substance abuse treatment and testing, maintaining his domestic violence program, managing his relationship with C.S., paying child support for A.B., and obtaining parenting and personal assessments. He identified a Las Vegas family counselor, pediatrician, and elementary school, and, on August 21, 2005, he divorced C.S.
¶ 22 On November 16-22, 2005, the rest of the trial was held. On November 22, 2005, the trial court took the case under advisement, and on January 5, 2006, it filed a 16-page memorandum opinion, the contents of which are discussed below. The court concluded that it was satisfied DSHS had presented clear, cogent, and convincing evidence establishing the criteria set forth in RCW 13.34.180(1), and that it was satisfied by a preponderance of the evidence that A.B.'s permanent placement with T.L. would be in A.B.'s best interests. The court was also satisfied, it said, "that it is in the child's best interest to maintain a relationship with her father and his family provided that the continuation of that relationship does not constitute a perpetual challenge to the legitimacy *1109 of the placement with [T.L.]."[12] Nowhere in its opinion did the court state that Salas was then unfit to parent. Believing that "the only way to resolve this dilemma is through the creation of an open adoption" and that "open adoption would allow for the child and for the continuation of the father-child relationship," the court concluded by directing the parties
to engage in discussions to determine whether an open adoption is possible and then to report back to the Court within thirty days from the date herein. If it turns out that the parties cannot agree on this alternative, then the Court will hear further argument and will decide if the best interests of the child in having a permanent home with [T.L.] require the termination of the father-child relationship.[13]
¶ 23 Although neither party has furnished us with a record of any subsequent court proceedings, it is apparent that the parties were unable to reach agreement. Thus, on March 31, 2006, the court entered formal written findings of fact and conclusions of law. Parroting the language of RCW 13.34.180(1)(d) and (e), the court found that "[a]ll services ordered under RCW 13.34.136 and all necessary and reasonable available services capable of correcting parental deficiencies within the foreseeable future have been offered or provided in an express and understandable manner,"[14] and that "[t]here is little likelihood that conditions will be remedied so that the child could be returned to or placed with her father in the near future."[15] Nowhere in its findings and conclusions, however, did the court expressly find that Salas was then unfit to be a parent.
¶ 24 Also on March 31, 2006, the trial court entered an order terminating Salas' relationship with his daughter. Salas appealed to the Court of Appeals, which affirmed, and then to this court, which granted discretionary review.

I
¶ 25 As noted at the outset, Salas now argues (a) that a parent has a due process right to have his or her relationship with a natural child terminated only if the trial court makes a finding of current parental unfitness, and (b) that in this case the trial court did not make such a finding. Thus, he concludes that the trial court's order terminating his relationship with his daughter violated his right to due process. In addition to arguing the flip side of Salas' issues, the State responds that we must imply the necessary finding and that it trumped Salas' right to such a finding by presenting substantial evidence. Rejecting these responses, we agree with Salas.

A
¶ 26 The first question here is whether a parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child. According to the United States Supreme Court, this court, and our Court of Appeals, the answer is yes.
¶ 27 In Santosky v. Kramer, 455 U.S. 745, 760, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court said that "[v]ictory by the state [i.e., the entry of an order terminating parental rights] entails a judicial determination that the parents are unfit to raise their own children." Moreover, the Court went on to say that "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." Id.[16] Concluding that this interest *1110 required more protection from error than was afforded by a mere preponderance-of-evidence standard of proof, the Court held that the State had to prove the elements of its case that were necessary to terminate the parent-child relationship by a standard of proof "equal to or greater than" clear and convincing evidence. Id. at 769, 102 S.Ct. 1388.
¶ 28 In In re Dependency of K.R., 128 Wash.2d 129, 141-42, 904 P.2d 1132 (1995), this court cited and followed Santosky. We held that Washington's termination statute, RCW 13.34.180(1), implicitly requires evidence of current parental unfitness, and thus "comports with the constitutional due process requirement that unfitness be established by clear, cogent, and convincing evidence."[17] We further held that "after reviewing the entire record and examining the requirements of RCW 13.34.180 and 13.34.190,"[18] the trial judge had made the required findings, albeit implicitly.
¶ 29 In at least six cases, our Court of Appeals has ruled or noted similarly. In In re Interest of S.G., 140 Wash.App. 461, 468-69, 166 P.3d 802 (2007), Division Three ruled, "The court must first conclude that the parent is deficient before it can terminate the parent's legal relationship with his child.... Without a problem, there can be no solution." In In re Dependency of T.L.G., 126 Wash. App. 181, 203, 108 P.3d 156 (2005), Division One stated, "Termination must be based on current unfitness; children may not be removed from their homes merely because their parents are mentally ill." In In re Dependency of A.S., 101 Wash.App. 60, 70-71, 6 P.3d 11 (2000) (citing Santosky, 455 U.S. 745, 102 S.Ct. 1388; K.R., 128 Wash.2d at 141-42, 904 P.2d 1132), Division One noted that it is a "constitutional due process requirement that unfitness be established by clear, cogent and convincing evidence." In In re Dependency of A.W., 53 Wash.App. 22, 29, 765 P.2d 307 (1988) (citing Krause v. Catholic Cmty. Servs., 47 Wash.App. 734, 743, 737 P.2d 280 (1987)), Division One said that "termination decisions are predicated upon present parental unfitness." In In re Welfare of C.B., 134 Wash.App. 942, 143 P.3d 846 (2006), Division Two essentially held that where the evidence was insufficient to support finding that the mother of child was currently deficient, the trial court could not make such a finding, and without such a finding, the trial court could not terminate the mother's relationship with her child. In In re Welfare of Churape, 43 Wash.App. 634, 638, 719 P.2d 127 (1986), Division Three essentially held that the trial court could not terminate the relationship between a father and his children where the evidence was insufficient to support a finding that the father was currently deficient at the time of trial, even if the evidence showed that the father was deficient at an earlier time. Based on the rulings of all of these courts, we hold that a parent has a constitutional due process right not to have his or her relationship with a natural child terminated in the absence of a trial court finding of fact that he or she is currently unfit to parent the child.

B
¶ 30 The next question is whether the trial court actually made such a finding here. Neither party has pointed us to anything in the record demonstrating that the trial court made the required finding expressly. Nor have we ourselves discovered anything to that effect. Necessarily then, we conclude that the trial court did not make the required finding expressly.
¶ 31 The State asks us to fill the void by implying that the trial court found Salas was not currently fit to parent A.B. at the time of trial. As support for its request, the State relies on K.R., 128 Wash.2d 129, 904 P.2d 1132, wherein we implied a finding of current parental unfitness even though the trial court had not made the finding explicitly. In K.R., as discussed above, we agreed that a finding of current parental unfitness is necessary to sustain a judgment terminating parental rights, but we then stated, "[N]o explicit *1111 finding of current parental unfitness is required. However, if the State proves the allegations [set forth in RCW 13.34.180], an implicit finding of current parental unfitness has been made." Id. at 141-42, 904 P.2d 1132 (citing Krause, 47 Wash.App. at 742, 737 P.2d 280).
¶ 32 At issue here is whether this language from K.R. always, or only sometimes, permits an appellate court to imply or infer a finding of current parental unfitness. Because the facts and circumstances under which an appellate court is asked to imply or infer a finding of current parental unfitness can vary so dramatically from case to case, it cannot reasonably be asserted that just because an implication or inference can sometimes be drawn, it can always be drawn. Accordingly, we conclude that when an appellate court is faced with a record that omits an explicit finding of current parental unfitness, the appellate court can imply or infer the omitted finding ifbut only ifall the facts and circumstances in the record (including but not limited to any boiler plate findings that parrot RCW 13.34.180) clearly demonstrate that the omitted finding was actually intended, and thus made, by the trial court. To hold otherwise would be illogical, and it would permit trial and appellate courts easily to sidestep the due process requirement that a judgment terminating parental rights be grounded on an actual (as opposed to a fictional) finding of current parental unfitness.[19]
¶ 33 Significantly, the trial court in this case made a number of findings that affirmatively conflict. Although the trial court entered boiler plate findings that parroted each element of RCW 13.34.180(1)in finding of fact 1.32, for example, the court parroted RCW 13.34.180(1)(e) by finding "little likelihood that conditions will be remedied so that the child can be returned to or placed with her father in the near future"[20]it also entered individually tailored findings to the contrary. It stated, for example, that Salas had been "clean and sober" since late 2001;[21] that he had "participated in a variety of services" since early 2002;[22] that he had been steadily employed since returning to Las Vegas in 2005; that he had "indicated from the very beginning a strong desire to have custody of the child and to also have his own family involved in her life;"[23] and that despite Salas and his family having "made almost heroic efforts" to make their visits with A.B. meaningful, they had been unable to establish a "close attachment" between Salas and A.B.[24] Although the trial court also found that the problems between Salas and A.B. were "profound and intractable," it strongly implied that those problems were not attributable to Salas when, in the very same finding by which it exonerated DSHS from responsibility for such problems, it speculated, without mentioning Salas, that the problems were perhaps "the result of subtle changes in the child's relationship with her caretaker and her original status as a drug-affected newborn."[25] Given their conflicting nature, these individually tailored findings make it impossible to discern that the trial court actually found that Salas was currently unfit to parent his daughter, and, as a result, we may not now imply such a finding.
¶ 34 We confirm this conclusion by looking to the trial court's memorandum opinion, which contains many additional statements inconsistent with an actual finding that Salas was currently unfit at the time of trial. It states, for example, that "the father has presented some excellent credentials as a responsible adult:"

*1112 (a) He has a good job, a demonstrated work ethic, and a commitment to providing financial support for his family[.]
(b) He has overcome a substance abuse problem, been clean and sober for four years, and been willing and able to continue counseling and treatment as required[.]
(c) He has participated in domestic violence and anger management counseling[.]
(d) He has maintained a patient and loving commitment to visitations with his child, despite frequent indications of resistance by the child[.]
(e) He is a part of a loving and caring extended family who maintain a safe and stable home in Las Vegas[.]
(f) He has disengaged himself physically and legally from a dysfunctional and unhealthy relationship with [C.S.] and taken appropriate steps to care for two children from that relationships.[26]
It also states, for example:
[C]ertain legal troubles in Las Vegas and Yakima, as well as financial difficulties, have hampered [Salas'] ability to successfully complete all treatment recommendations and to maintain consistent and meaningful contact with the child. Despite these circumstances he has demonstrated a sincere and conscientious commitment in this case regarding his child.[27]
The father has had over 100 visitations with the child, including many where his mother was also present. The father and his family have made almost heroic efforts to participate in the visits and to try and make them meaningful, but despite their efforts the visitations have not established a close attachment between father and child.[28]
There have been indications over the last two and a half years of great potential for an attachment between the father and child in this case. Given the father's significant progress and his potential to be a positive male figure in the child's life, it would not be in the child's best interest to completely sever the relationship with his child at this time so long as this relationship does not conflict with the permanent placement for the child.[29]
Reading this record as a whole, we cannot conclude that the trial court was actually making a finding that Salas was currently unfit to parent A.B., and, accordingly, we may not imply such a finding here.
¶ 35 The State contends that it presented substantial evidence of Salas' current unfitness to parent. The effect, the State seems to conclude, is to adversely impact Salas' argument that the trial court violated his right to due process when it terminated his relationship with his daughter without first finding that he was currently unfit to parent. We cannot agree.
¶ 36 To ask whether the State presented substantial evidence is to ask whether the trial court could have found for the State.[30] To ask whether Salas' due process right to a finding of unfitness was violated is to ask what the trial court did find. But to hold that the trial court could have found Salas currently unfit says nothing about whether the trial court did (or did not) find that. Thus, even if we assume the contention is correct, it is nonresponsive and irrelevant to Salas' due process argument,[31] and it can have no impact here, adverse or otherwise. Accordingly, we decline to address it further.

*1113 II
¶ 37 In addition to arguing that the trial court violated his right to due process by not actually finding that he was currently unfit, Salas argues that the trial court misapplied the two-step statutory scheme embodied in RCW 13.34.180-.190. To reiterate part of what we said near the outset of this opinion, when a Washington court applies the first step of that scheme, it is obliged to focus on the alleged unfitness of the parent,[32] which must be proved by clear, cogent, and convincing evidence,[33] and when it applies the second step, it focuses on the child's best interests,[34] which need be proved by only a preponderance of the evidence.[35] But it is "premature" for the trial court to address the second step before it has resolved the first.[36]
¶ 38 Parenthetically, Washington's two part scheme seems to be based at least in part on Santosky.[37] While addressing the constitutionality of New York's statutory termination scheme, the United States Supreme Court characterized the scheme as having two phases: a "factfinding" phase designed to deal with terminating the parent's rights, and a "dispositional" phase designed to deal with the child's best interests. The Court then said, "The factfinding [between parent and the State] is not intended to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parent would provide the better home."[38] Rather, the Court said, it is designed to focus on whether "the natural parents are at fault" and litigate questions of "what the State did" and "what the natural parents did not do."[39] In contrast, the dispositional phase is when the court can base its order "`solely on ... the best interests of the child,'" and it comes "[a]fter the State has established parental unfitness."[40]
¶ 39 In the course of deciding whether to terminate Salas' parental rights, the trial court in this case reasoned in part that A.B. had been living with T.L. all of her life; that A.B. was fully integrated into T.L.'s home and had not developed a significant relationship with Salas; and "that it is in [A.B.'s] best interest to maintain a relationship with her father and his family provided that the continuation of that relationship does not constitute a perpetual challenge to the legitimacy of the placement with [T.L.]."[41] In making these and other similar statements, the trial court was obviously focusing on A.B.'s best interests, as opposed to Salas' current unfitness. Accordingly, we are required to hold that the trial court reasoned erroneously.
¶ 40 In conclusion, a judgment terminating parental rights cannot stand absent a finding of current parental unfitness. An appellate court may imply the existence of such a finding ifbut only ifthe facts and circumstances *1114 clearly demonstrate that the finding was actually made by the trial court. Given that the facts and circumstances here do not so show, and that lack of an essential finding is presumed equivalent to a finding against the party with the burden of proof,[42] we reverse the judgment entered below and remand to the trial court with directions that unless the parties agree otherwise in writing or on the record of the court, it shall supervise the prompt but orderly transfer of A.B. to Salas' home and, once that is accomplished, dismiss the case with prejudice.
WE CONCUR: SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, and RICHARD B. SANDERS, Justices.
MADSEN, C.J. (concurring).
¶ 41 I agree with the majority that the trial court's termination analysis is in error and the case should be reversed and remanded. I write separately because I believe the reason the analysis is in error is that the trial court's finding under former RCW 13.34.180(1)(e) (2001), regarding the likelihood the father's deficiency could be remedied in the near future, is not supported by clear, cogent, and convincing evidence.

Discussion
¶ 42 In order to grant a petition terminating parental rights, the court must find all of the following factors: (a) the child is a dependent, (b) the court has entered an RCW 13.34.130 dispositional order, (c) the child has been removed from the parent's custody for 6 months, (d) services to correct parental deficiencies have been offered, (e) "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," and (f) continued contact with the parent "clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1).
¶ 43 Specifically, factor (e) under RCW 13.34.180(1) is defined as follows:
That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:
(i) Use of intoxicating or controlled substances...
(ii) Psychological incapacity or mental deficiency of the parent ...
¶ 44 In order to terminate parental rights, the trial court must find all of the RCW 13.34.180(1) factors proved by clear, cogent, and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Washington courts have previously found the RCW 13.34.180(1) factors focus on the adequacy of the parent. In re Interest of S.G., 140 Wash.App. 461, 467, 166 P.3d 802 (2007) (citing In re Welfare of C.B., 134 Wash.App. 942, 952, 143 P.3d 846 (2006)); In re Welfare of Churape, 43 Wash. App. 634, 638-39, 719 P.2d 127 (1986). This is in contrast with step two of the parental termination analysis under RCW 13.34.190(2), which focuses on the best interests of the child. Id.
¶ 45 The trial court found A.B.'s father, Salas, had taken sufficient actions to cure his deficiency and had "made almost heroic efforts" *1115 to be involved in A.B.'s life. Clerk's Papers (CP) at 90-91. This finding is supported by clear, cogent, and convincing evidence in the record.
¶ 46 Salas has actively participated in custody proceedings and has taken steps to create and adhere to a plan to create a stable, healthy environment for A.B. Although he was unable to leave the state of Nevada, he participated in the initial dependency hearing through counsel. He participated in the June 2005 bench trial and made significant efforts to address the court's concerns. He resumed visitation, obtained a domestic violence evaluation, and participated in domestic violence treatment. In August 2005, he presented the court with a plan to treat, manage, and monitor his substance abuse and to continue participation in a domestic violence program. He located resources to benefit A.B. including a pediatrician, elementary school, and family counselor. In late August, he ended his dysfunctional marriage with C.S.
¶ 47 He has also taken steps to manage his drug addiction. According to the trial court's written findings, Salas last abused drugs in late 2001. He continued to participate in a Nevada drug court program and found steady employment during the time he was prohibited from leaving Nevada.
¶ 48 He has taken proactive steps to visit A.B. and positively engage in her life. When Salas successfully completed his Nevada drug court program, he visited A.B., and shortly thereafter, moved to Yakima. Within two days, he met with the Department of Social and Health Services (DSHS) caseworker who conducted a urine test and parenting assessment. He began visiting A.B. regularly and frequently under supervision. The caseworker was very positive about the progress in Salas's relationship with A.B., in which A.B. exhibited trust in Salas as a dependable, consistent figure in her life. The caseworker planned to increase unsupervised visitation and place A.B. with Salas permanently, despite T.L.'s opposition.
¶ 49 Salas's visitation was interrupted for four months by his arrest (and subsequent immigration hold) for an incident in which he pushed a police officer who intervened in a fight between Salas and his then girl friend, C.S. Once released, Salas resumed visitation every week for a year, despite A.B.'s newly exhibited reluctance to interact with or bond with Salas, which the caseworker attributed to the gap in visitation. Salas missed one visit scheduled in February 2005, when he moved to Las Vegas, but saw A.B. again in May and arranged for a new visitation schedule with the DSHS caseworker. When the DSHS caseworker informed him weekend visits were not available, Salas accommodated the schedule and agreed to visit on Friday. Again, when he visited, A.B. refused to interact with him, and he did not see her again before the trial on June 13, 2005. After the trial, he visited A.B. every two weeks until his parental rights were terminated. The trial court found that Salas's inability to bond was not caused by Salas.
¶ 50 Based on these facts, the trial court concluded that "it is in the child's best interests to maintain a relationship with her father" provided the relationship did not jeopardize A.B.'s relationship with her current caregiver, T.L., but ultimately terminated Salas's parental rights when Salas and T.L. could not reach an agreement on an open adoption. Mem. Op. at 15-16. The court's findings, which do not include a finding that Salas was a deficient parent, are inconsistent with its conclusion that RCW 13.34.180(1)(e) was met. If Salas was not deficient, the court could not as a legal matter find his deficiency could not be cured.
¶ 51 In addition, evidence suggests the adoptive parent, T.L., may have been the motivating factor behind the child's inability to bond. The DSHS caseworker indicated that T.L. disapproved of Salas's visitation rights early on. During visitation, A.B. continually looked to T.L. rather than engaging with Salas.[1] T.L. did not reach an agreement with Salas that would facilitate the open adoption the trial court favored. The trial court also noted the inability of A.B. to bond with Salas was possibly "the result of *1116 subtle changes in the child's relationship with her caretaker[, T.L.]." CP at 91. Given the evidence, the trial court erred by failing to consider T.L.'s influence (and perhaps interference) in analyzing whether Salas was unlikely to be able to cure any deficiencies.
¶ 52 In sum, the trial court erred by concluding RCW 13.34.180(1) factor (e) was met by clear, cogent, and convincing evidence because the evidence does not support finding that a deficiency on the father's part caused the inability to bond. The trial court also erred by failing to consider facts in the record that suggest the adoptive parent T.L. may have contributed to the child's inability to bond. Because the trial court erred, the termination conclusion must be reversed and the case must be remanded to the trial court for proceedings consistent with this opinion.
I CONCUR: CHARLES W. JOHNSON, Justice.
CHAMBERS, J. (dissenting).
¶ 53 It is not appropriate for this court to reverse the trial court based on its "failure" to make a finding no one asked it to make and that, at the time, it reasonably believed it had impliedly made by following this court's jurisprudence. I would affirm the Court of Appeals' well reasoned decision. I respectfully dissent.
¶ 54 Rogelio Salas posed two questions for our consideration:
1. Where a parent is presently fit, competent, and able to immediately take custody of his child, does the entry of an order terminating that parent's parental rights violate his fundamental, constitutionally-protected liberty interest in the care and custody of his child, requiring reversal of that order?
2. Should the Court grant review and hold that absent proof of a current parental deficiency, consideration of the statutory factors set forth in RCW 13.34.180(1) and whether termination of parental rights is in the child's best interests violates due process?
Mot. for Discretionary Review at 1-2. These questions presume a present fitness that was not found by the trial court. Put another way, Salas contends that the termination of his parental rights violated due process because the trial court did not explicitly find that he was an unfit parent on the day the termination decision was made. I tend to think that making that finding would be good practice, if requested. But Salas did not request it, and making such a finding is not required by constitutional, case, or statutory law.
¶ 55 Instead, our law establishes that termination of parental rights is appropriate once the State has met its burden of proving by clear, cogent, and convincing evidence that (a) the child has been found dependent; (b) a dispositional order has been entered; (c) the child has been removed from the parent for at least six months under a dependency order; (d) all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been meaningfully offered; (e) there is little likelihood conditions can be remedied so that the child can be returned to the parent in the near future (from the child's perspective); and (f) continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. In re Dependency of K.R., 128 Wash.2d 129, 141-42, 904 P.2d 1132 (1995). Our case law also establishes that once the trial court finds that the State has carried its burden, it has impliedly found that the parent is unfit. Id. at 142, 904 P.2d 1132 ("Because the termination statute requires proof by clear, cogent, and convincing evidence, which necessarily and implicitly includes evidence of current parental unfitness, it comports with the constitutional due process requirement that unfitness be established by clear, cogent, and convincing evidence." (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982))). In this case, the trial court made those statutory findings. Clerk's Papers (CP) at 93 ("All elements of RCW 13.34.180 have been established by clear, cogent, and convincing evidence."). Therefore, as a matter of law, it found Salas unfit. K.R., 128 Wash.2d at 142, 904 P.2d 1132. None of the cases cited by the majority are to the contrary.
*1117 ¶ 56 The majority asserts that the basis for the trial court's finding of factor (e), that there is little likelihood that the conditions will be remedied in the future, is not identified in the trial court's finding. Majority at 15 n. 20. But there is ample evidence that the conditions that make Salas an unfit parent are not likely to be remedied in the near future. It is true that Salas has made significant efforts to reunite with his daughter. However, the majority overlooks that Salas's own drug use, history of violence toward loved ones, and involvement with the criminal justice system, is a significant cause of the factors that cannot be remedied in the near future and that persuaded the trial judge that continuation of the parent-child relationship diminished A.B.'s prospects for integration into a stable and permanent home. See RCW 13.34.180(1)(e), (f). There is evidence that Salas was a drug dealer and introduced A.B.'s mother to heroin. Salas assaulted his girl friend and threw the family dog against a wall. The record indicates he never finished his assigned domestic violence treatment. Salas testified that he did not need domestic violence treatment, which makes me concerned that he is unwilling to accept the seriousness of his misconduct or the necessity of changing it. At the time of trial, at least one of his other children was being cared for by his mother and stepfather. About the time A.B. and Salas seemed to be making progress, he was arrested and thrown in jail. A parent educator testified that he had major concerns about A.B.'s safety if she were placed with Salas. Based on these and many other facts, the trial judge found:

There is little likelihood that conditions will be remedied so that the child can be returned to or placed with her father in the near future. Despite the 100 visits and parent education provided to the father over the past three years, the problems with the father-child relationship will still take long-term efforts to change. It will take years of transition and work with the child.
CP at 91 (Finding of Fact (FF) 1.32) (emphasis added). That is what the statute and our case law requires. That is what the trial judge found. The court also found:
The child has been living with her current caretaker virtually all of her life, for almost 4 years. She is fully integrated into that home, which has been demonstrated to be a stable home. [The foster mother] has also demonstrated a commitment to the child and a desire to adopt her. There is currently no legal designation of a permanent home for the child and the continuation of the father-child relationship does in fact prevent the continuation of a stable home and the establishment of a permanent home with the caretaker at the earliest possible time. Thus, continuation of the parent-child relationship clearly diminishes the child's prospects for integration into a stable and permanent home. The child knows who the father is, but a significant relationship has not developed. The father and his family do not recognize [the foster mother] as a legitimate family member. Because of the belief of the father and his family, they will continue to fight for the child which will interfere with her ability to achieve and maintain permanency. A permanent setting for the child cannot be established until the father's rights have been terminated.
CP at 92 (FF 1.34).
¶ 57 Given that the emphasized language in finding of fact 1.32 mirrors the statutory factor, I conclude the main condition to be remedied was the lack of attachment between Salas and A.B. None of the findings that the majority contends "affirmatively conflict" with Salas's unfitness are relevant to this sad fact. See majority at 15-16 (canvassing evidence of Salas's fitness). Salas's sobriety, his continued employment, and his efforts to be involved in A.B.'s life are worthy of praise. But they do not change the fact that despite over 100 visits, the child continued to be traumatized by his visits and no attachment has formed.
¶ 58 A.B.'s inability to form an attachment with Salas is extraordinary and tragic, but also real and severe. This is not a case of a parent and child who were temporarily not getting along. It was not a case of a new relationship that needed time to grow and develop. After 100 visits over the course of *1118 years, A.B. was still traumatized when she was required to visit with Salas. This is not a case about a parent and child failing to bond because one parent, through no fault of his or her own, not being present in the child's life. That case would raise very different legal issues. Instead, this case demonstrates the inability, throughout many years and many sincere efforts, of Salas and his daughter to forge the emotional attachment necessary to her well-being. Regrettably, I believe that that inability renders Salas an unfit parent for this child.
¶ 59 The idea that the trial court's failure to explicitly make a finding of unfitness that at the time it reasonably should have believed it had implicitly made should act as a finding of fitness confounds me and is inconsistent with modern appellate practice. See, e.g., State v. Stein, 140 Wash.App. 43, 66, 165 P.3d 16 (2007); State v. Souza, 60 Wash.App. 534, 543, 805 P.2d 237 (1991) (remanding after finding a necessary element was missing but supported by disputed evidence in the record).
¶ 60 The court's order today also confounds me. A.B. is living with her family. She has been raised by her mother's cousin almost since birth. Her mother's cousin has also adopted A.B.'s younger half brother, who has lived with his eldest sister his entire life. The "prompt but orderly transfer" ordered by the court today will wrench this child out of the only home she has ever known and deprive a brother of his sister. Even if the trial judge did err by following this court's well settled case law, the proper remedy would be remand for further proceedings.
¶ 61 I would affirm the courts below, and thus, respectfully dissent.
I CONCUR: GERRY L. ALEXANDER, Justice.
NOTES
[*] Judge J. Dean Morgan is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] RCW 13.34.180(1); In re Interest of S.G., 140 Wash.App. 461, 467, 166 P.3d 802 (2007) (citing In re Welfare of C.B., 134 Wash.App. 942, 952, 143 P.3d 846 (2006); In re Welfare of Churape, 43 Wash.App. 634, 638-39, 719 P.2d 127 (1986)).
[2] Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); RCW 13.34.180(1).
[3] RCW 13.34.190; S.G., 140 Wash.App. at 467, 166 P.3d 802 (citing C.B., 134 Wash.App. at 952, 143 P.3d 846); Churape, 43 Wash.App. at 638-39, 719 P.2d 127.
[4] RCW 13.34.190.
[5] Churape, 43 Wash.App. at 638-39, 719 P.2d 127.
[6] Report of Proceedings (RP) at 248; State's Am. Suppl. Br. at 5.
[7] Clerk's Papers (CP) at 89.
[8] 5 RP at 908.
[9] Id.
[10] Id. at 909.
[11] Id. at 908-09.
[12] Mem. Op. at 15.
[13] Mem. Op. at 16.
[14] CP at 93.
[15] Id.
[16] See also Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (quoting Smith v. Org. of Foster Families, 431 U.S. 816, 862-63, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment) ("We have little doubt that the Due Process Clause would be offended `[i]f the State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'")).
[17] K.R., 128 Wash.2d at 142, 904 P.2d 1132.
[18] Id. at 146, 904 P.2d 1132.
[19] Cf. State v. Stein, 140 Wash.App. 43, 66, 165 P.3d 16 (2007) (appellate court implied finding where record showed that trial court had actually made it, even though trial court had not explicitly stated that it was making finding); State v. Souza, 60 Wash.App. 534, 543, 805 P.2d 237 (1991) (appellate court could not imply finding where evidence was disputed).
[20] CP at 91. The finding did not identify the conditions to which the court was referring.
[21] Id. at 88.
[22] Id. at 87.
[23] Id. at 89.
[24] Id. at 90-91.
[25] Id. at 91.
[26] Mem. Op. at 14-15.
[27] Id. at 10.
[28] Id. at 11.
[29] Id. at 15.
[30] E.g., In re Dependency of C.B., 61 Wash.App. 280, 283-85, 810 P.2d 518 (1991) (in a termination case, evidence is substantial (or, equivalently, sufficient to support a trial court finding) if, taking the evidence in the light most favorable to the party who prevailed below, a rational and reasonable trier of fact could find each element of the case in accordance with the applicable burden of persuasion); see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (same formulation in a criminal case).
[31] Although Salas argued in the Court of Appeals that the evidence was not substantial, he abandoned that argument when he moved this court for discretionary review. Mot. for Discretionary Review at 1-2. We also did not grant discretionary review on that question.
[32] RCW 13.34.180(1); S.G., 140 Wash.App. 461, 166 P.3d 802; Churape, 43 Wash.App. at 638-39, 719 P.2d 127.
[33] Santosky, 455 U.S. at 749 n. 3, 102 S.Ct. 1388; RCW 13.34.180(1).
[34] RCW 13.34.190(1); S.G., 140 Wash.App. at 467, 166 P.3d 802; Churape, 43 Wash.App. at 638-39, 719 P.2d 127.
[35] RCW 13.34.190.
[36] Churape, 43 Wash.App. at 639, 719 P.2d 127 ("Here, it appears the trial court made a premature `best interest' determination without first fully examining the reunification factors.").
[37] 455 U.S. at 759-60, 102 S.Ct. 1388.
[38] Id. at 759, 102 S.Ct. 1388.
[39] Id. at 759-60, 102 S.Ct. 1388.
[40] Id. at 760, 102 S.Ct. 1388 (quoting N.Y. Family Court Act § 631(c) (McKinney 2007)); see also Troxel v. Granville, 530 U.S. 57, 72-73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (due process clause does not permit the State to infringe on parents' child-rearing decisions merely because judge believes those decisions could have been better); In re Custody of Shields, 157 Wash.2d 126, 143, 136 P.3d 117 (2006) ("best interests" analysis, standing alone, cannot substitute for an inquiry into parental unfitness); In re Custody of Smith, 137 Wash.2d 1, 20, 969 P.2d 21 (1998) ("best interest of the child" is insufficient to overrule a parent's right to raise his or her child); Churape, 43 Wash.App. at 639, 719 P.2d 127 ("trial court made a premature `best interest' determination without first fully examining the reunification factors").
[41] Mem. Op. at 16.
[42] State v. Armenta, 134 Wash.2d 1, 14, 948 P.2d 1280 (1997) ("In the absence of a finding on a factual issue we must indulge the presumption that the party with the burden of proof failed sustain their burden on this issue."); Smith v. King, 106 Wash.2d 443, 451, 722 P.2d 796 (1986) ("[W]e presume from the absence of further findings in that regard that second purchasers [who had the burden of proof] failed to sustain their burden."); Golberg v. Sanglier, 96 Wash.2d 874, 880, 639 P.2d 1347, 647 P.2d 489 (1982) (same); Pilling v. E. & Pac. Enters. Trust, 41 Wash.App. 158, 165, 702 P.2d 1232 (1985) (same).
[1] Although this could be attributed to the presence of T.L. as a consistent person in her life, rather than an unhealthy influence of T.L., it is some evidence.