IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 34587-4-III |
| T.D. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

KORSMO, J. — B.D. appeals from a trial court order terminating her parental rights to her son, T.D. Because the record supports the trial court's determination that (1) her parental deficiencies were unlikely to be resolved in a timely fashion, (2) she was an unfit mother, and (3) termination was in the best interests of T.D., we affirm the trial court.

## FACTS

Ms. B.D. was the mother of T.D., and her live-in partner, D.W., was the alleged father. Social workers from the Department of Social and Health Services (DSHS) became interested in the couple when D.W. applied for food stamp and medical benefits for T.D., but did not know the child's name and date of birth. DSHS removed the child from the couple's home when he was 17 months of age because B.D. often left the child in the care of D.W., a convicted sex offender.

The shelter care hearing required B.D. to undergo a parenting assessment and a psychological evaluation.[1] She was also granted two visits per week with T.D. The child reacted negatively to visitation with his mother. In one instance he curled up on a shelf and did not want to interact with her. It was believed the child had suffered significant past trauma. An agreed order of dependency entered in December 2014, that incorporated her prior obligations and, as a result of her parenting assessment, directed that she receive individual and family counseling and Circle of Security training. Her visitation was extended to three times a week because she had consistently visited T.D.

Dr. Sean Smitham diagnosed B.D. with a mixed personality disorder and recommended therapy, parent-training workshops, lifestyle changes, and more stable housing that did not depend on D.W. At the first review hearing May 30, 2015, the court directed that B.D. complete mental health treatment and family therapy with Circle of Security training, but she was reluctant to do so. Instead, she continued with individual therapy at Frontier Behavioral Health with Kristina Li.

At the second review hearing on August 3, 2015, DSHS notified B.D. that it would be filing for termination of her parental rights.[2] She then abandoned her reluctance to attend the Circle of Security training and the family therapy. In December, B.D. tried to

---

[1] She successfully passed a urinalysis and no chemical dependency treatment was required. A second urinalysis the following year also was negative.

[2] DSHS subsequently obtained an order of default on D.W.'s parental interest in T.D., as well as an order defaulting anyone other than D.W. as a potential father for T.D.

take T.D. home from a visitation, going outside in the cold without putting a coat on the child. A fight with three visitation workers ensued in the parking lot. It took 10 minutes before B.D. stopped resisting and returned the screaming child. She later admitted that she had made a mistake.

The termination petition proceeded to trial on May 23, 2016. The court heard from Dr. Smitham, Ms. Li, caseworker Alyson Gamache, family therapist Heidi Anderson, and guardian ad litem Jill Leonetti. Ms. Leonetti testified that it was not in the best interests of T.D. to be placed with his mother. She was concerned about the child's safety after observing B.D. attempt to interfere with the medication being given to the child. The court terminated the parent-child relationship and entered lengthy written findings the following month. Some of those findings that bear on the issues in this appeal are noted below.

With respect to the mother's parenting deficiencies, the court wrote in its Finding VI:

> There is little likelihood that conditions will be remedied so that the child
> can be returned to [B. D.] in the near future. In coming to this conclusion,
> the court considered the degree to which Ms. [B.D.] was making progress
> in the remedial services in which she was engaged.

Clerk's Papers (CP) at 96. The court further noted:

> As a result of her mental health issues, Ms. [B.D.] had difficulty
> recognizing and responding appropriately to her child's cues; she displayed
> poor judgment when it came to assessing the appropriateness and safety of

3

individuals she allowed to have access to her child; she exhibited an inability to empathize with her child; and she struggled with placing her child's needs above what she perceived as her own needs. Ms. [B.D.'s] prognosis for changing these debilitating personality traits, even with appropriate mental health intervention, was poor to guarded according to Dr. Smitham.

CP at 96. The court recognized that Ms. B.D.'s intellectual difficulties contributed to her challenges in overcoming mental health issues:

[Ms. Anderson] therefore tailored her instruction methods to take this into account by employing more visual, hands-on instruction techniques. While Ms. [B.D.] seemed during sessions to respond positively to this instructional approach, Ms. Anderson's work with Ms. [B.D.] over time was ultimately unsuccessful: Ms. [B.D.] exhibited an inability to carry over what she had learned from one session to the next and was never able to develop any insight into her parental deficits. . . .
        Ms. [B.D.] failed to make any significant progress in addressing her parental deficiencies during the course of the dependency; therefore, a rebuttable presumption exists that there is little likelihood that conditions will be remedied so that the child can be returned to Ms. [B.D.] in the near future. . . . It is clear that Ms. [B.D.] does not believe that she has any mental health issues, nor has she gained any parenting skills or insight into her issues during the period of the dependency. This child cannot be returned to her now or at any time in the foreseeable future, given her failure to address her issues in any meaningful way.

CP at 97-98.

The court addressed Ms. B.D.'s ability to parent in Finding VII:

[Ms. B.D.'s] unaddressed mental health issues render her incapable of providing a safe, stable and suitable home for the child at this time. She has no insight into her issues, professing herself to be unaware of why the Department has concerns for her ability to parent and why the Department wants her to participate in services. She believes that the Department's

4

motive in removing her child from her care is financial; her proof of this is that the government takes taxes out of her paychecks. She believes that the child's putative father, [D.W.], despite his criminal history and documented risk to children, is an appropriate caregiver for the child. If the child were to be placed in her care at this time, he would be at extreme risk of neglect due to her mental health issues, and at risk of neglect and even abuse due to Ms. [B.D.]'s lack of insight regarding who is a safe and appropriate caregiver for the child.

CP at 98. The following findings addressed the best interest of T.D.:

## VIII.

Continuation of parent-child relationship clearly diminishes the child's prospects for early integration into a permanent and stable home. . . . The child has lived for at least half his life in a turmoil of uncertainty, instability and trauma . . . . Ms. [B.D.] has shown no motivation to address her parental deficits would clearly diminish the child's prospects for early integration into a stable and permanent home.

## IX.

It is in the child's best interests to terminate the parent-child relationship. Considering the testimony of all witnesses, including that of the guardian ad litem, the court finds that termination is necessary to serve this child's best interests. There is no alternative permanent arrangement, including guardianship or continuing the child in dependency status, which would better serve this child's interests.

CP at 98-99.

Ms. B.D. timely appealed to this court. A panel considered the case without hearing argument.

ANALYSIS

Ms. B.D. challenges the court's findings concerning her ability to overcome her parenting deficiencies, her unfitness as a parent, and the best interests of T.D. We conclude that the evidence supports the trial court's determination of those matters.

Our review of a termination decision largely is controlled by statute. Washington courts must follow a two-step process when deciding whether to terminate a parent-child relationship. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents" and requires DSHS to prove, by clear, cogent, and convincing evidence, the six termination factors set forth in RCW 13.34.180(1). *Id.* "'Clear, cogent, and convincing' means highly probable." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Due process also requires the trial court find by clear, cogent, and convincing evidence that the parent is currently unfit. *In re A.B.*, 168 Wn.2d at 918. Where a trial court finds all of the elements of the statute by clear, cogent, and convincing evidence, it implicitly finds the parent is unfit by the same standard. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-577, 257 P.3d 522 (2011). If DSHS meets its burden as to the six termination factors, "the trial court must find by a preponderance of the evidence that termination is in the best interests of the child." *M.R.H.*, 145 Wn. App. at 24 (citing RCW 13.34.190(2)). Only if the first step is satisfied may the court reach the second step. *A.B.*, 168 Wn.2d at 911.

6

The six termination factors that must be established are: (1) the child has been found to be dependent, (2) the court has entered a dispositional order, (3) the child has been removed from the custody of the parent for at least six months, (4) all the necessary services have been afforded to the parent to correct the parental deficiencies, (5) there is little likelihood of remedying the parental deficiencies, and (6) continuation of the parent child relationship clearly diminishes the child's prospects of permanent placement. *See* RCW 13.34.180(1). Typically, only one or more of the last three factors are at issue on appeal since the first three factors are foundational requirements for trial.

This appeal challenges the fifth of the noted statutory factors, so we turn first to that issue.

*Remedying Parental Deficiencies*

Ms. B.D. argues that the evidence does not support the trial court's finding that there was little likelihood she could remedy her parental deficiencies in a timely manner. The evidence, however, amply supports the finding.

As noted above, we review this contention for "clear, cogent, and convincing evidence." That standard is defined, in major part:

> A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent *in the near future.* The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental

7

deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to . . . .

(ii) Psychological incapacity or mental deficiency of the parent.

RCW 13.34.180(1)(e) (emphasis added). The "near future" has been used interchangeably with the term "foreseeable future." *In re Dependency of P.D.*, 58 Wn. App. 18, 26-27, 792 P.2d 159 (1990); *M.R.H.*, 145 Wn. App. at 25.

Emphasizing her dutiful participation in all offered services, B.D. argues that the court's finding that she would not progress in the near future is not supported by sufficient evidence. We disagree. Dr. Smitham's prognosis was "poor to guarded." CP at 96. While B.D. was *participating* in the required programs, she was not *progressing* in them. Ms. Anderson adjusted her approach in order to account for B.D.'s learning difficulties, but even that proved unsuccessful. B.D. failed to carry over what she learned from one session to the next. CP at 97.

Despite actively engaging in all required services, B.D. was not retaining the skills and information she was receiving. She had made little or no progress in even appreciating that she had problems that needed to be addressed. The trial court understandably concluded that her failure to improve to that point meant that she would not, in the near future, successfully overcome the many difficulties confronting her.

The evidence supported the court's determination.

8

*Parental Fitness*

For the same reasons that she believed that the failure to progress finding was erroneous, B.D. contends that the court's finding that she was currently unfit to parent T.D. is erroneous. For largely the same reasons, the trial court's finding was supported by the evidence.

In addition to establishing the six factors of RCW 13.34.180(1), the State must also establish that the parent is currently unfit. This finding is required because of the parent's constitutional due process right not to have the parent-child relationship terminated in the absence of a factual finding that he or she is currently unfit to parent the child. *A.B.*, 168 Wn.2d at 920; *In re K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995). Current parental unfitness may be implicitly established when DSHS proves all six of the statutory elements. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-577, 257 P.3d 522 (2011). A court also can explicitly make a finding of current parental unfitness. *A.B.*, 168 Wn.2d at 920-921.

Here, the trial court made an explicit finding of current unfitness. The evidence dictated that finding. It was supported by testimony of B.D. who had no insight into her mental health issues, and also believed that DSHS's motives for taking T.D. were financial and that sex offender D.W. was an appropriate caregiver for her child. Her treatment providers detailed B.D.'s lack of insight and lack of empathy for her child.

T.D. had lived a life of turmoil in his mother's care and his mother showed no appreciation of that problem, let alone any interest in addressing it. CP at 98.

The court understandably determined it would be extremely risky to reunify B.D. with her child in those circumstances. She was not able to parent T.D. and did not place his best interests above her own. The trial court's determination that B.D. was not currently fit to parent her child was supported by clear, cogent, and convincing evidence.

*Best Interests of the Child*

The remaining statutory inquiry is whether the termination of the parent-child relationship is in the best interests of the child. RCW 13.34.190(1)(b). We agree with the trial court's determination that it was.

Once the State has established the factors of RCW 13.34.180(1) by clear, cogent, and convincing evidence, it must prove by a preponderance of the evidence that termination of the relationship is in the best interests of the child. RCW 13.34.190(1); *In re Dependency of A.M.M.*, 182 Wn. App. 776, 784-785, 332 P.3d 500 (2014). The factors involved in determining the best interests of a child are not capable of specification because each case must be decided on its own facts and circumstances. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 572, 815 P.2d 277 (1991). Unlike the previous findings, which consider the parent's interests, the "best interests" test focuses on the child's interests.

If a parent has been unable to rehabilitate over a lengthy dependency period, a court is justified in finding termination in the child's best interests rather than leaving the child in the limbo of foster care for an indefinite period while the parents seek to rehabilitate themselves. *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). Permanency planning goals should be achieved at the earliest possible date, preferably before the child has been in out-of-home care for 15 months. RCW 13.34.145.

The trial court found that it was in T.D.'s best interests to terminate the parent-child relationship. CP at 99. The court relied on the testimony of the guardian ad litem and the caseworker, both of whom testified that placement with a foster family would better serve T.D.'s interests. The child had been in foster care for 18 months, nearly half of his life, and both witnesses thought that permanency planning goals should be sought as soon as possible. *See T.R.*, 108 Wn. App. at 164-165; RCW 13.34.145.

The trial court found that no better permanent arrangement existed. B.D. had gone through eight months of family therapy and a year of individual therapy, but had made no progress in remedying her deficiencies. The child's best interests would not be furthered by a continued, indefinite foster care placement status. *T.R.*, 108 Wn. App. at 167.

The evidence strongly weighs in favor of the trial court's best interests determination. No viable alternative existed; maintaining the status quo did not aid the

11

No. 34587-4-III
*In re the Parental Rights to T.D.*

child in the least. The trial court's finding was supported by well more than a

preponderance of the evidence.

We affirm the ruling terminating the parent-child relationship between B.D. and

T.D.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Siddoway, J.

12