IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of | ) | No. 32770-1-III |
| | ) | (consolidated with |
| | ) | No. 32774-4-III, |
| R.H., M.H., Z.H., K.H., and E.H. | ) | No. 32771-0-III, |
| | ) | No. 32772-8-III, |
| | ) | No. 32773-6-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |

SIDDOWAY, C.J. — S.H. appeals the termination of her parental rights with respect

to five of her children, contending that (1) the Department of Social and Health Services

(Department) did not provide her with all services necessary to correct her parental

deficiencies, (2) the State failed to prove that her parental deficiencies could not be

remedied in the near future, and (3) the trial court did not find that she was currently unfit

to parent. Because the evidence was sufficient to support the trial court's findings and it

implicitly found that she was currently unfit to parent, we affirm.

No. 32770-1-III (cons. w/ Nos. 32774-4-III, 32771-0-III, 32772-8-III, 32773-6-III)
*In the Matter of the Welfare of R.H.*

FACTS AND PROCEDURAL BACKGROUND

S.H. is the biological mother, and A.H., the biological father, of ten children. The oldest child was removed from the parents and adopted in 1993. The remaining nine children remained in the parents' custody until November 2012.

Between 1996 and 2012, Child Protective Services received some 36 referrals concerning this family, and the parents both had 27 "founded" findings against them. The Department's dependency petition filed in November 2012 alleged that "[t]he parents [had] demonstrated a longstanding and ongoing negligence and disregard for the health and safety of their children, which places the children at significant risk of harm." Plaintiff's Ex. 2 (P2) at 3. It included an allegation that:

> Between May 2012 and August 2012 the . . . children were caught a total of nineteen times either stealing or destroying property from the local Fred Meyer. . . . A consistent theme in the shoplifting by the children [has] been hunger and they were seeking out food to eat. Neither of their parents were home to either give them money to purchase food or to go and buy food for them.

*Id.* The petition summarized police reports as documenting an occasion in August 2012 when law enforcement returned one of the children to the family home and "it appeared that there was no adult present at the home to provide supervision. The house was almost bare with no food available. The inside of the home was filthy." P2 at 4. It recounted law enforcement's observation in a July 30, 2012 police report that "[t]here were bad

2

living conditions, mattresses on the floor with no sheets or blankets and no food," *id.*, and

on March 27, 2012, that

> law enforcement responded to the family residence. The parents were out
> at a local night club and were not present to supervise their children. . . .
> When law enforcement arrived at the home they found no electricity and no
> food. . . . The home was completely trashed with feces on the floor,
> possessions scattered throughout the home with an overwhelming odor of
> urine, and rotten food was present.

P2 at 6-7.

At the time of a shelter care hearing in November 2012, S.H. and A.H.'s nine

children ranged in age from 4 to 15. It was determined that all would be placed in shelter

care but the possibility of moving the children to the maternal grandfather's care would

be investigated. Eventually, the four older children entered into a guardianship with the

maternal grandfather that was later dismissed. This appeal concerns the termination

proceeding eventually commenced as to the five youngest children.

The court entered an agreed order of dependency in January 2013. The children

remained in foster care. S.H. participated in some services for the first two months of the

dependency but failed to participate for the following four months. She contacted her

therapist in January 2014, asked to resume treatment, and participated for over two

months before disappearing at the end of September 2013.

The Department filed a petition for termination of parental rights on October 1,

2013, and trial was held in May 2014. A.H. failed to appear in person or by counsel and

3

an order of default was entered against him.[1]  S.H. also failed to attend the termination

trial but a lawyer appeared to defend on her behalf.  At the conclusion of trial the court

concluded that the Department had proved the required statutory elements by clear,

cogent, and convincing evidence and that termination of the parent child relationship was

in the best interests of the children.  It entered an order terminating S.H.'s parental rights.

She appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and

management of their child does not evaporate simply because they have not been model

parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*,

455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).  Because parents have a

fundamental liberty interest in the custody and care of their children, the State may

terminate parental rights "'only for the most powerful [of] reasons.'" *In re S.J.*, 162 Wn.

App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (quoting *In re Welfare of*

*A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington's termination of parental rights statute responds to this constitutional

command by providing a two-step process before a court may terminate parental rights.

---

[1] Around the time of the first review hearing, allegations that A.H. sexually abused one of his children surfaced and a warrant was issued for his arrest.  A.H. could not be located, and he stopped participating in the dependency.

"The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence," while "[t]he second step focuses on the child's best interests and need be proved by only a preponderance of the evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnotes omitted); RCW 13.34.190(1)(b). Only if the first step is satisfied may the court reach the second. *Id.*

The first step—the demonstration of parental inadequacy—required the trial court in this case to find that the State had proved each of six statutory elements, some procedural and some substantive, and that an order terminating parental rights was in the best interests of the child. RCW 13.34.190(1)(a)(i), (b); .180(1). Due process further required that it find that S.H. was currently unfit to parent the children. *A.B.*, 168 Wn.2d at 920.

S.H. challenges the trial court's findings of the following substantive elements, required by RCW 13.34.180:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

and

> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

She also argues that the trial court did not find, explicitly or implicitly, that she was an unfit parent.

On review, "[t]he court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. *In re S.J.*, 162 Wn. App. at 881. "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *K.S.C.*, 137 Wn.2d at 925. "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." *Id.*

We review, first, whether sufficient evidence supports the trial court's finding that all necessary services were expressly and understandably offered; second, whether sufficient evidence supports the finding that there is little likelihood that conditions will be remedied in the near future; and third, whether the court implicitly made the finding, required by due process, that S.H. was currently unfit to parent.

*I. Necessary services*

The State's burden of proving it offered all necessary services capable of correcting the parental deficiencies within the foreseeable future requires proof that it

offered services "tailored to each individual's needs." *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001).

At the shelter care hearing on November 15, 2012, the court's order provided for the following required services:

> The Department will make referrals for and the parents will participate in the below examinations, evaluations, or immediate services. Failure to comply with this order may result in contempt proceedings.

| Mother | Father | Service |
| --- | --- | --- |
| . . . . | | |
| ✔ | | Random UA/BA testing. Test until no THC and then upon reasonable suspicion. |
| ✔ | | Psychological evaluation by [Dr. Sean] Smitham or other provider approved by the parties or ordered by the court and follow recommendations[] w/ DV prevention |
| . . . . | | |
| ✔ | | Hands-on parent training by Shauna Hebner or other provider approved by the parties or ordered by the court and follow recommendations. |

Plaintiff's Ex. 3 (P3) at 7-8.

The State made the appropriate referrals and S.H. participated in the psychological evaluation with Dr. Smitham. Dr. Smitham's recommendations included, among other things, nutritional stabilization and a psychiatric consult should nutritional stabilization prove ineffective, individual counseling, family counseling, a chemical dependency evaluation, a bonding assessment, and a domestic violence (DV) victim evaluation or

services. The State referred S.H. to Linda Wirtz for family therapy to include hands-on parent training.

S.H. argues that the State did not provide her with a psychiatric evaluation, domestic violence evaluation or treatment, chemical dependency assessment or treatment, or a bonding assessment. Br. of Appellant at 21-22. Because she was not offered all the services recommended by Dr. Smitham, she argues that the State failed to prove that she was offered or provided with the necessary services capable of correcting her parental deficiencies.

The State responds that S.H. "did not consistently participate in any of the services the Department offered her and [ ] would not have benefitted from still more services being offered." Br. of Resp't at 12.

Regrettably, some parents facing the prospect of termination of their parental rights are unable or otherwise fail to make use of services provided. It is well settled that the statutory requirement to offer or provide corrective services does not contemplate an entirely one-way process, and "a parent's unwillingness or inability to make use of the services provided excuses the state from offering extra services that might have been helpful." *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) (citing *In re Welfare of Ferguson*, 41 Wn. App. 1, 6, 701 P.2d 513 (1985)). "Moreover, a parent's unwillingness or inability to make use of the services provided excuses the state

8

from offering extra services that might have been helpful." *Ramquist*, 52 Wn. App. at 861 (citing *Ferguson*, 41 Wn. App. at 6).

Even where the Department inexplicably fails to offer services to a parent, termination will still be deemed appropriate if the services would not have remedied the parent's deficiencies in the foreseeable future. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008) (citing *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001)). "Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." *Id.* (citing *In re Welfare of Ferguson*, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), *rev'd on other grounds*, 98 Wn.2d 589, 656 P.2d 503 (1983)).

We consider, then, whether the State was required but failed to offer a psychiatric evaluation, domestic violence evaluation or treatment, chemical dependency assessment or treatment, and bonding assessment and, if it did, whether its obligation to offer the services was excused or the offer would have been futile.

*Psychiatric evaluation.* In notes from a December 3, 2012 session with S.H., Dr. Smitham recommended adjustments to S.H.'s diet that might help S.H. "better manag[e] [her] energy and moods." Plaintiff's Ex. 15 (P15), (Dec. 3, 2012) at 7. He concluded that ideally, S.H. should follow the dietary recommendations for 6 to 8 weeks before psychiatric medication was considered. He added that "the patient may benefit from a psychiatric consult if the above recommendations do not result in noticeable change after

6-8 weeks of following the recommendations consistently." *Id.* In context, it is clear that the purpose of a psychiatric consult would be for the prescription of medication to address any problems with energy and mood management that dietary changes failed to resolve. In a note dated February 1, 2013, based on evaluative sessions in December and January, Dr. Smitham recommended a "[p]sychiatric consult (if nutritional stabilization isn't possible)." P15, (Feb. 1, 2013) at 2.

After completing a psychological evaluation of S.H. based on the December and January sessions, Dr. Smitham first saw S.H. for purposes of individual counseling on February 18, 2013. At trial, Dr. Smitham testified that at the time of the first individual therapy counseling session, S.H. was in the "precontemplative stage of change," meaning she was

> unaware of the trauma and significance of the problem in terms of how she may have contributed to it. There is a lot of blaming, a lot of statements that it was other people's fault, not a lot of self-awareness or acknowledging her role in that.
> So she didn't at that point seem to be interested in making any sort of change.

Report of Proceedings (RP) at 53-54. Dr. Smitham testified that S.H. "no-showed" for the remaining three sessions scheduled for February. RP at 54. She also failed to appear for the first of two sessions scheduled for March 2013 but did attend and participate in the second.

10

S.H. then "dropped out" of therapy until, in late July, she contacted Dr. Smitham to say that she would like to resume therapy. RP at 55. Dr. Smitham testified that he saw a lot of progress during S.H.'s sporadic attendance of sessions in July, August, and September.[2] But he also testified that S.H. again stopped attending therapy after September and that he did not hear from her in October, November, or December.

In January 2014, S.H. showed up at Dr. Smitham's office without advance notice and told him that she would again like to resume therapy. Although the State renewed its referral for S.H. to see him, S.H. cancelled the appointment scheduled for February. Dr. Smitham had no other appointments with S.H.

While S.H. is correct that the State did not refer her for a psychiatric consult, Dr. Smitham's recommendation of such a consult was for the possible prescription of medication, on the condition that she first attempt to manage her energy and mood through nutritional stabilization. There is no indication in the record that she ever followed the nutritional recommendations, let alone reported to Dr. Smitham that she had complied with the recommendations and they had failed to resolve complaints about her energy and mood. While Dr. Smitham's originally contemplated treatment steps failed to occur, the trial court could reasonably infer that it was because S.H. never complied with

---

[2] S.H. attended two of four sessions scheduled in August and two of four sessions scheduled in September.

the required first step of attempting to manage her energy and mood through nutritional stabilization.

The evidence does not support S.H.'s argument that her treatment ever reached the point at which a psychiatric consult was arguably necessary.

*Domestic violence victim counseling.* S.H. argues that the State failed to provide her with a domestic violence evaluation or services. The court's order required the Department to make a referral for a "psychological evaluation by [Dr. Sean] Smitham . . . w/ DV prevention." P3 at 7. The State did refer S.H. to Dr. Smitham for evaluation. During the few therapy sessions that S.H. attended, Dr. Smitham began to address the lingering effects of domestic violence in S.H.'s life. When she resumed sporadic treatment for a couple of months in July 2013, Dr. Smitham's notes indicate that the topics addressed included her attachment history and relationship history.

Dr. Smitham's initial recommendations of services (labeled "tentative") included "DV victim evaluation and/or services." P15 (Feb. 1, 2013) at 2. But apart from Dr. Smitham's own individual therapy sessions with S.H., no DV evaluation was ever performed nor were DV services provided. This is a case in which the trial court could reasonably conclude that any duty to offer DV services beyond those being provided by Dr. Smitham was excused, however. When S.H. demonstrated unwillingness to meaningfully pursue the individual therapy made available by the Department and that

12

included a DV component, the Department was not required to offer additional DV services.

*Chemical dependency.* During her evaluation by Dr. Smitham, S.H. revealed that she smoked marijuana every day, and had done so for 20 years or more. His notes reflect her explanation that "I feel out of myself when I'm not smoking, I don't feel like myself at all," and that "she is highly anxious without it." P15 (Dec. 3, 2012) at 2 and (Feb. 1, 2013) at 1. At the termination trial, Dr. Smitham testified that S.H.'s "one tool for managing agitation by her own self-report was smoking marijuana. So we needed to give her some other tools." RP at 60. He characterized her "long-standing pattern of substance abuse as her emotional kind of coping skill." RP at 69.

While one of Mr. Smitham's recommendations was that S.H. receive a chemical dependency evaluation, his notes reflect his own belief that she had an active chemical dependency. P15 (Feb. 2, 2013) at 1-2 and (Feb. 18, 2013) at 1. Her almost total noncompliance with the court ordered requirement that she participate in random UAs was further evidence of dependency: between November 2012 and the termination trial in May 2014, S.H. only participated in four UAs, all of which tested positive for THC. She was recognized as out of compliance with the court's order that she provide random UAs at every dependency review hearing.

13

There is no evidence in the record that the State referred S.H. for a chemical dependency assessment[3] but, as the State points out, "[h]er long history of marijuana use was already known to the Department." Br. of Resp't at 13.

S.H. argues on appeal that *treatment* of her chemical dependency issues would have "furthered [her] progress in other services to make it possible to remedy her deficiencies and reunite with her children," pointing out that the order from the dependency review hearing in July 2013 required that she complete a "CD Treatment/Assessment." Br. of Appellant at 26; Plaintiff's Ex. 6 (P6) at 4. The reference to "treatment" in the order appears to have been in error; the service is listed as one that had been "previously ordered" but "not yet been successfully completed," yet no prior order had required chemical dependency treatment. Dr. Smitham's notes and testimony reflect his opinion that S.H.'s marijuana use was a "coping" mechanism or "tool" for dealing with her anxiety. Since the individual therapy he was providing was with a view to the underlying source of her anxiety and providing her with other tools, there is nothing in the record to suggest that some other sort of chemical dependency treatment was necessary.

---

[3] In opening argument the State argued that S.H. "has refused to complete a chemical dependency assessment, although that has been recommended by the Department, particularly given her lack of follow-through with the urinalysis testing, but she has declined to participate in that through the various court orders and through her attorney." RP at 7. We find no evidence in the record to support that claim.

S.H.'s almost total noncompliance with the court ordered UAs and her infrequent and sporadic participation in individual therapy further demonstrate her unwillingness to make use of those services addressed to chemical dependency that had been ordered by the court. Again, "a parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *Ramquist*, 52 Wn. App. at 861.

*Bonding and attachment evaluation.* S.H. contends that the State's failure to refer her for a bonding and attachment assessment prevented her from receiving additional services and information that "would have aided the court in its assessment of whether the mother could remedy the relationship with her children in the children's near future." Br. of Appellant at 27.

At the outset of the dependency, the court ordered hands-on parent training for S.H., as well as family visitation. After his initial psychological evaluation, Dr. Smitham recommended that S.H. receive a parenting assessment and a bonding assessment. The State referred S.H. to Linda Wirtz for family therapy and hands-on parent training. One goal Ms. Wirtz had for the family therapy sessions was that "[t]he children [would] demonstrate behaviors of a secure attachment with their mother and overcome their anxiety about their mother's availability and events that led to their placement." Plaintiff's Ex. 16 (P16) (February 1, 2013) at 2.

It was reported at a review hearing in March 2013 that S.H. had participated in the hands-on parent training that took place during the family visits. But by the end of March, S.H. was frequently missing visits and Ms. Wirtz discharged her because the missed visits were difficult on the children. S.H. attempted to resume the hands-on training and visits in July 2013 with limited success. Her last attendance at family therapy was in September 2013.

S.H.'s demonstrated inability or unwillingness to consistently attend the visits being observed by the family therapist providing hands-on parenting training excused the State from offering a bonding and attachment assessment. Bonding and attachment were clear objectives of the family therapy and individual counseling opportunities that S.H. treated so dismissively. The State was not required to offer an additional service when S.H. was continually failing to participate in two closely related services.

### II. Finding that deficiencies cannot be remedied in the foreseeable future

If the State offers or provides all necessary services reasonably capable of correcting parental deficiencies within the foreseeable future and the parent does not substantially improve within a year of the dependency order, a presumption arises that the State has demonstrated RCW 13.34.180(1)(e)'s requirement that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). "A parent's

16

unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the [Department] has satisfied RCW 13.34.180(1)(e)." *Id.* "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

The Department social worker assigned to this dependency proceeding expressed her opinion that the near future for S.H.'s five youngest children was "now," and testified:

> I think that [S.H.] has been dealing with these deficiencies for many, many years. And we have been at this dependency for 18 months now, and she's made no measurable progress. I think it would be well into the future—up until she's—is absolutely able to address her own personal trauma, where she does seem willing or able to do.
> So I don't see in the foreseeable future she will be able to make the progress she needs for her children.

RP at 176-77.

S.H. implicitly concedes that this testimony would be sufficient if the State had offered the necessary services, but challenges the State's (and its witnesses') underlying assumption that those services had been provided. Br. of Appellant at 30-31 ("[T]he social worker's testimony . . . presupposes that the mother was offered all necessary services to combat [her] personal issues. . . . Without adequate provision of services, the social worker's testimony regarding the children's near future does not support the termination order"). We have already held that the State met its burden of proving that

17

its obligation to provide necessary services was met or excused. That holding is dispositive of this assignment of error as well.

### *III. Current unfitness*

"[A] parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child." *In re Welfare of A.B.*, 168 Wn.2d at 918. To meet its burden to prove current unfitness in a termination proceeding, the State must prove by clear, cogent, and convincing evidence that the parent's deficiencies prevent him or her from providing the child with "basic nurture, health, or safety." *In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014).

The trial court in this case made no explicit finding that S.H. was currently unfit to parent her children. "[W]hen an appellate court is faced with a record that omits an explicit finding of current parental unfitness, the appellate court can imply or infer the omitted finding if—but only if—all the facts and circumstances in the record . . . clearly demonstrate that the omitted finding was actually intended, and thus made, by the trial court." *In re Welfare of A.B.*, 168 Wn.2d at 921.

S.H. argues that the trial court's oral ruling does not reflect a belief on the part of the court that she was currently unfit. She also argues that certain statements by the trial court in announcing its ruling improperly shifted the burden of proof, requiring her to prove that she was a fit parent. She points to the court's statement—after observing that

the final issues in the case included "whether at this point in time the mother is unfit to be

a parent to her children"—that:

> You know, it is hard for me to draw any conclusions. But it is
> difficult for me when she's not here.
> I can't penalize her for that in that sense. But, you know, certainly I
> would expect her, if she really wanted to parent these children, to be here to
> tell me that, absent her being in the hospital somewhere, or in jail. And
> Counsel has indicated that she's not going to tell me where she's at, and
> that's fine, but absent me having some reason that she is not here, I have to
> assume that she has the ability to be here. I don't have any other way to
> view it.
> And her not being here obviously has some impact upon this case.

RP at 316-17. If this was the sum total of the court's explanation, followed by, "I

therefore find her unfit," there might be some merit to S.H.'s argument. But when

considered as a whole, the foregoing statements merely conveyed the court's concern that

S.H.'s failure to appear and present evidence in her own behalf left it without any

evidence to counter the State's evidence of her current unfitness. The court continued:

> But more than that, by far more than that, is just the fact that it
> appears that she has in effect not decided to do the hard work, and has sort
> of given up, if you will, and just walked away; incredibly sad as that is.
> *There is obviously no way that I can based on that find that she is a
> fit parent*, given the deficiencies that existed, given the fact that I don't
> have a record of those here. *So it would be impossible to make that finding.*

RP at 316-17 (emphasis added).

The court's statements that "[t]here is obviously no way that I can . . . find that she

is a fit parent" and "it would be impossible to make that finding" indirectly but explicitly

convey its belief that S.H. was currently unfit to parent her children. And that belief was

19

based not on a failure or proof by S.H. but on the State's evidence of her history of failing to take advantage of offered services, indicating that she had "given up" and "just walked away." RP at 317.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____     _____
Korsmo, J.                                           Lawrence-Berrey, J.