FILED
MAY 24, 2016
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Termination of | ) | |
| Parental Rights to | ) | No. 33289-6-III |
| | ) | (consolidated with |
| F.H. | ) | No. 33290-0-III) |
| | ) | |
| and | ) | |
| | ) | |
| D.H. | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — After an almost four-year dependency and a two-day trial, the trial court entered an order terminating the appellant mother's parental rights to two of her children. The mother appeals the order, arguing the court erred when it found that the Department of Social and Health Services (DSHS) provided her with all necessary services to correct her parental deficiencies and that she is currently an unfit parent.

We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

The appellant is the mother of 10 children, her parental rights to two of whom are at issue in this appeal.

On May 19, 2011, DSHS caseworkers filed dependency petitions in Pend Oreille County, asking the court to declare the two children dependent. At the time, the two children—both boys—were ages 6 and 4 (almost 5).

This was the third dependency filed with respect to these two children. The first was an in-home dependency initiated in Spokane County in June 2007. It lasted for eight months, through February 2008.

The second was filed five months later, in July 2008, again in Spokane County, although it was transferred to Pend Oreille County. It lasted 20 months, through March 2010. The second concluded with an award of custody of the boys[1] to their father.

The third was filed a little over one year later, after the father failed to pick up the younger son from Head Start.

An order of dependency and disposition order as to the mother was not entered for 18 months, which we surmise was because the assigned DSHS caseworker had a history with the family and proceeded directly to offer services. The social worker, Kathy Bennett, had been assigned to the second dependency when it was transferred to Pend Oreille County. According to Ms. Bennett, the three dependencies involved overlapping issues of mental health problems, possible substance abuse, and domestic violence in the home.

During the second dependency, the mother was referred to Dr. Jennifer Van Wey, a clinical psychologist, for a neuropsychological evaluation. Dr. Van Wey, who conducted the evaluation in 2009, diagnosed the mother with post-traumatic stress

---

[1] All of our references to "the boys" and "the sons" are to the children who are parties to the termination orders on appeal.

disorder (arising from exposure to sexual abuse as an adolescent and later, secondary exposure having family members in a crisis); bipolar disorder, mixed type, without psychotic features; and personality disorder, not otherwise specified, with narcissistic, dependent and histrionic traits. She observed that the mother had "poor judgment and follow-through" and demonstrated poor medication compliance. Report of Proceedings (RP) at 33. Dr. Van Wey's opinion at the time of her 2009 evaluation was that in combination, the mother's mental issues were "very debilitating" and children in her care would "absolutely [be affected]." RP at 33-34. Her prognosis for the mother was "guarded." RP at 35. Dr. Van Wey's recommendation for the mother included a chemical dependency evaluation, a psychiatric evaluation, a neurological evaluation, and a parenting attachment evaluation.

After the third dependency was filed, Ms. Bennett initially referred the mother for a psychological evaluation with Dr. Sean Smitham, an attachment assessment with Carol Thomas, parenting and family therapy with Amanda Clemons, and hair follicle tests to detect substance use.

Dr. Smitham, a clinical psychologist, conducted a psychological evaluation of the mother based on three visits that began in April 2012. He diagnosed her with undifferentiated somatoform disorder, and schizotypal personality disorder with features of narcissistic, histrionic or dependent traits. Undifferentiated somatoform disorder is described as one or more physical complaints, not feigned, that persist for six months or

3

longer, cannot be fully explained by any known general medical condition, and that cause clinically significant distress or impairment in functioning. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.82, at 490-91 (4th rev. ed. 2000) (DSM-IV-TR). Schizotypal personality disorder is described as "a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior." *Id.* § 301.22, at 697. Although his diagnoses differed from Dr. Van Wey's, he believed that both their diagnoses "capture similar sort of content, maybe emphasizing or de-emphasizing certain areas." RP at 60.

Dr. Smitham recommended individual and family therapy, an updated neuropsychological evaluation,[2] UAs, and—depending on the results of the UAs—a substance abuse evaluation. His prognosis for the mother was "poor to guarded," in light of the history of services provided to her without success. RP at 66.

The mother was also referred for and participated in an attachment assessment with Carol Thomas, a therapist and parent-child evaluator, in April 2012. Her two sons were present for the assessment. Its purpose was to assess the nature and quality of her relationship and interaction with the boys. During the assessment, the older boy, then age

---

[2] A psychological evaluation of the sort done by Dr. Smitham takes into account an individual's current emotional state, their emotional functioning, and their intellectual functioning. A neuropsychological evaluation of the sort performed in 2009 by Dr. Van Wey goes beyond that, examining neurocognitive functioning as well.

4

seven and a half, did not use his mother as a source of security, emotional support, or regulation. He acted, instead, in a disrespectful, challenging, and sometimes violent manner toward her. He discounted statements she made, claiming she did not know anything, and called her "crazy" and a "bad mom." RP at 171. While the mother tried to direct and redirect his behavior, none of her efforts worked. Based on the assessment, Ms. Thomas recommended the mother participate in mental health counseling, a neuropsychological evaluation, a psychiatric evaluation, a chemical dependency evaluation, and follow all recommendations. She also recommended the mother and her two sons participate in family therapy.

In October 2012, Ms. Bennett referred the mother for family therapy, including parenting instruction. The mother and her sons engaged in 16 sessions with Amanda Clemons, a mental health counselor. One goal of the sessions was for the mother to "establish herself as a consistent and—predictable caregiver." RP at 82-83. Other goals were for the two boys to "develop a healthy attachment to their mother," and "learn to see their mother as an authority figure." RP at 83.

According to Ms. Clemons, the mother was never able to establish herself as an authority figure or as a consistent or predictable caregiver before services were terminated on account of her failure to abide by an attendance agreement.[3] Ms. Clemons

---

[3] After showing up late for a session, the mother was required to enter into an attendance contract that required her to call on the morning a session was scheduled, to

viewed her as making "little to no progress" during the 16 sessions. RP at 90. She also reported that the mother did not take full advantage of information and strategies offered. Since the boys were not able to develop a healthy attachment to their mother, Ms. Clemons recommended that DSHS pursue a permanent plan for the children "outside of [the mother's] full-time care." RP at 89.

When the disposition order for the mother was filed on November 1, 2012, it required her to "(a) Successfully complete a neurological assessment by a provider approved by the parties and follow all recommendations[,] (b) Successfully engage in [the then-ongoing] parenting/attachment therapy with Amanda Clemons or other mutually-approved provider and follow all recommendations[, and] (c) Participate in a drug/alcohol evaluation by a provider approved by the parties and follow any recommended chemical dependency counseling include [sic] UA/BA/hair follicle testing." Ex. PET 1 at 5 (Order of Dependency).

On May 23, 2013, two years after the third dependency had been commenced, the State filed a petition to terminate both parents' parental rights to the two boys. The father did not enter an appearance or answer the petition, and an order of default was entered against him in October 2013.

---

confirm whether she would attend. The contract provided that service would be discontinued in the event of two failures to call.

Despite the petition to terminate, and even after the family therapy was unsuccessful, the mother continued to attend supervised visits with her sons. Between July 2013 and February 2014, the visit supervisor estimated the mother attended 25 to 30 visits with the boys, missing only one. But the boys, who lived in Pend Oreille County and would be transported to Spokane for visits, began to balk at attending.[4] It first happened in April 2012, but Ms. Bennett was thereafter often able to cajole them into attending. Beginning on February 22, 2014, however, the boys ceased attending entirely. By the time visits ceased being scheduled, the boys had no-showed for 10 visits since December 2013.

In review and other hearings taking place in and after February 20, 2014, the court found that the mother was not complying with the requirement for a drug/alcohol evaluation or chemical dependency screening, random UA/BA testing, recommendations stemming from the psychological evaluation, family therapy, mental health treatment or individual counseling.

The termination trial took place on January 7, 2015, and February 2, 2015. The mother was represented by counsel. The court heard testimony from eight witnesses[5] as well as a statement from the children's guardian ad litem. A principal issue in dispute

---

[4] There was a four hour block of time on Saturdays that the boys would have visits in Spokane: two hours with their mother, followed by two hours with their father.

[5] Dr. Van Wey, Dr. Smitham, Ms. Clemons, visit supervisor Joann Carstens, Ms.

was the reason why the mother had never received an updated neuropsychological evaluation or the court-ordered neurological examination.[6]

Ms. Bennett testified that three referrals for an updated neuropsychological evaluation of the mother (and any recommended therapy) were made in the course of the third dependency. The practice in making referrals was to send the referral to the provider, who would then attempt to contact the mother to schedule an appointment. If the provider was unable to get in touch with the mother, he or she would let Ms. Bennett know, and she would send a follow-up letter and e-mail to the mother and mother's attorney.

The first referral was made in January 2012, to Dr. Van Wey. It did not result in an appointment; Ms. Bennett testified that a neuropsychological examination "wasn't court-ordered at that time, so she didn't go." RP at 126. Dr. Van Wey testified similarly that Ms. Bennett had contacted her office a number of times trying to get the mother in for an updated evaluation but "[t]hey just haven't been able to get her to get in . . . call, or come, or follow up." RP at 41.

A second referral made in December 2013 resulted in the scheduling of an appointment, but the mother no-showed.

---

Thomas, Ms. Bennett, the children's 17-year-old half-sibling, and the mother.

[6] The neurological evaluation would have been conducted by a neurologist and would evaluate whether there was a chemical imbalance in her brain that was causing the

A third referral was made in October 2014, but the provider was unable to contact the mother. It therefore provided appointment dates and times to Ms. Bennett, who passed them along, but the mother did not attend or follow up.

As for the neurological evaluation, Ms. Bennett contacted three providers in an attempt to schedule one for the mother. Each required a primary care physician's referral before scheduling an appointment. Ms. Bennett informed the mother of the referral requirement and told her that DSHS would pay the cost of an appointment with the mother's primary care physician if the physician would make the referral. The mother then made an appointment with a clinic but on the day of her appointment, clinic staff contacted Ms. Bennett, told her that they were a naturopathic clinic, and were "adamant they would not make a referral." RP at 132. Ms. Bennett testified that at that point, all she could do was "encourag[e] [the mother] to continue trying with a primary care physician." RP at 134.[7]

---

mother's odd behavior.

[7] Ms. Bennett acknowledged the mother was convinced (incorrectly) that the problem was a financial one (that the neurologist required advance proof of payment) rather than a medical one. On that score, Ms. Bennett testified that while the third dependency was pending, the mother stopped receiving medical assistance through the State. Ms. Bennett communicated with the mother about reapplying for assistance, explaining that if the mother was denied, the Department could then (and only then) assist with paying for treatment. According to Ms. Bennett, the mother would not reapply for State assistance.

Ms. Bennett testified the boys had been in their current foster care placement since June 2011. While early on in the dependency, they had told Ms. Bennett they wanted to go back to living with their father, they later became attached to their foster family and for the year and a half before the termination trial had expressed their wish to be adopted by their foster parents. The guardian ad litem also expressed the view that the children's best interests would be served through terminating the parent-child relationship because the children had become integrated in their foster home.

The mother testified on her own behalf, claiming to have participated in all services made available to her. According to her, if services had not been completed, it was because Ms. Bennett had not set them up. She admitted that communication between her and Ms. Bennett had been difficult and it was "partially my fault, partially hers." RP at 200. The mother acknowledged she did not have a phone and had to communicate with Ms. Bennett by e-mail, but she thought "most of the time they got through. A lot of times her answers would get spammed—I don't know why." *Id.* She testified that her boys learned the disrespectful behavior they sometimes showed to her from their father, who was abusive toward her.

At the conclusion of the testimony, the mother's lawyer argued that the diagnoses of Dr. Van Wey and Dr. Smitham were inconsistent, and

> So there's a real question as to the validity of what mental health issues she has. And you heard extensive testimony about a neurological examination that just frankly didn't happen. There were efforts on her part

10

to make it happen. Social worker testified there were efforts on her part to make it happen. Questions still remain about what is the neurological situation that [the mother] may be facing. Is there an organic diagnosis that needs to be made? Are there—what is going on? We just frankly don't know.

RP at 218. She also argued, "I think the Department can find the financing for an evaluation should they find it important, and . . . worth doing, and they just—they didn't." *Id.*

The trial court announced its ruling from the bench, finding that the State had proved a basis for termination of the mother's parental rights by clear and convincing evidence. Addressing the mother's argument that she had not been provided with the recommended examinations, the court stated:

> Now, were all the services reasonably available capable of correcting the parental deficiency in the foreseeable future, were those offered. And that narrows down to this neuropsychological evaluation and possible—medical treatment for any of the disorders that had been identified by the doctors.
> And there the court finds that by clear, cogent and convincing evidence that Ms. Bennett's description of her efforts to work with [the mother] to get that accomplished, I find that more credible, or more believable. Now I don't in any sense believe that [the mother] is trying to mislead the court or anything of that kind, but I do believe that Ms. Bennett is in a better position, inasmuch as this is her profession, she has the advantage of paper work and written materials to refresh her memory, that her recollection about her efforts to set up this neuropsychological evaluation—which would have been the next step—is on the record, here, and I find that that has been proved.

RP at 224.

11

The court entered an order terminating both parents' parental rights in April 2015. The mother appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful of reasons.'" *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (internal quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington's termination of parental rights statute responds to this constitutional command by providing a two-step process before a court may terminate parental rights. The first step requires that the State prove six statutory elements, the first three of which are procedural and are seldom in dispute.[8] Where a termination decision is appealed, it is

---

[8] The three rarely disputed elements appear at RCW 13.34.180(1)(a)-(c) and provide:
 (a) That the child has been found to be a dependent child;
 (b) That the court has entered a dispositional order pursuant to RCW 13.34.130; [and]
 (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency.

the State's proof of the remaining elements that are most often challenged—those being

its burden of proving

> [t]hat the services ordered [to be provided to the parent] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided,

RCW 13.34.180(1)(d);

> [t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future,

RCW 13.34.180(1)(e); and

> [t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(f).

This first step "focuses on the adequacy of the parents and must be proved by clear, cogent and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnote omitted). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Proof of the six statutory elements by clear, cogent and convincing evidence satisfies the requirement of due process that a parent be found currently unfit before terminating the parent-child relationship. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

13

The second step is for the court to ascertain the best interests of the child. RCW 13.34.190. "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

In this case, the mother challenges the State's proof of only one of the six elements provided by RCW 13.34.180(1): that services ordered by the court, or reasonably available and capable of correcting her parental deficiencies within the foreseeable future had been expressly and understandably provided. RCW 13.34.180(1)(d). She also challenges the trial court's finding that she was presently unfit to parent. Br. of Appellant at 2-3.

Whether a termination order satisfies statutory requirements is a question of law that we review de novo. *K.N.J.*, 171 Wn.2d at 574. "The court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. *S.J.*, 162 Wn. App. at 881. "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." *K.S.C.*, 137 Wn.2d at 925.

We address the mother's challenges in turn.

14

*Necessary services*

The State's burden of proving it offered or provided all services ordered by the court or necessary, reasonably available, and capable of correcting the parental deficiencies within the foreseeable future, requires proof that it offered services "tailored to each individual's needs." *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). With respect to necessary services, the mother argues "the State failed to refer [the mother] to a primary care physician so that she could obtain a recommended neurological consult," and failed to "offer services to address the effects of the domestic violence [the mother] suffered and the fact that her children were resisting visits with her." Br. of Appellant at 2-3.

In addition to finding the ultimate fact that DSHS had understandably offered or provided court ordered and other necessary services, the court found:

> Ms. Bennett . . . worked very hard to identify appropriate services and service providers, and to relay information and referrals to the parents. [The mother] was capable of understanding the requirements of the court and the referrals from the Department, and was able, if she had chosen, to comply with these requirements. . . . The services that were offered and provided were appropriate to address the issues with which the parents presented, and might have been very efficacious in dealing with their areas of parental deficiency.

Clerk's Papers (CP) at 110.

Substantial evidence supports the trial court's findings. With respect to domestic violence, evidence was presented that Ms. Bennett made three referrals for the mother to

15

obtain an updated neuropsychological evaluation and any treatment recommended. As described by Dr. Van Wey, a part of the clinical interview conducted in a neuropsychological examination is for the parent to "provide[ ] her—her own personal history, her personal narrative." RP at 23. In Dr. Van Wey's evaluation in 2009, the mother did not tell the doctor about domestic violence in her adult life, although she talked about abuse as a child. As Dr. Van Wey described the clinical interview with the mother in 2009, "the way she provided information from her history was inconsistent. She would be vague about talking about her involvement with [Child Protective Services], while she would be sort of . . . overly talkative about other topics that weren't helpful in terms of the evaluation." RP at 25.

Ms. Bennett recognized the mother needed an updated neuropsychological evaluation, hence the three referrals. Such an evaluation would have called on the mother to disclose domestic violence in her relationship with the boys' father and, if she had disclosed domestic violence, would have led to individual counseling that was already part of the referral. But the mother passed on three separate referrals for such an evaluation, each of which was good for six months.

It is well settled that the statutory requirement to offer or provide corrective services does not contemplate an entirely one-way process, and "a parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *In re Dependency of Ramquist*, 52 Wn. App. 854,

16

861, 765 P.2d 30 (1988) (citing *In re Welfare of Ferguson*, 41 Wn. App. 1, 6, 701 P.2d 513 (1985)).

As for the neurological evaluation, Ms. Bennett's testimony established she contacted three providers, explained the need for a physician referral to the mother, offered that DSHS would pay for what turned out to be the mother's appointment at a naturopathic clinic, and, when the clinic refused to provide a referral, continued to encourage the mother to find a primary care physician. The mother provides no authority for her argument that all of this is insufficient since DSHS did not find her a different primary care physician. The trial court found that the mother "was capable of understanding the requirements . . . and the referrals . . . and was able, if she had chosen, to comply" and the mother provides no argument that this finding is not supported by the evidence. CP at 110. It is therefore a verity on appeal. *In re A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

Other evidence also calls into question whether the mother desired a closer examination of any physiological explanation for her behavioral deficits. Both Dr. Van Wey and Dr. Smitham questioned whether the mother might be engaged in substance abuse and there were recommendations, and ultimately court orders, requiring chemical dependency assessments and UAs. Ms. Bennett speculated that the mother abused drugs, because she was arrested twice on charges related to methamphetamine during the dependencies, participated in just one UA throughout all of the dependencies, and—

17

despite three referrals—failed, ever, to submit to the hair follicle test ordered by the court.

Also, when questioned at trial by her own lawyer about whether she could get a neurological evaluation at the clinic she was using at that time, the mother—who had expressed unhappiness about the discord that arose when the naturopathic clinic realized DSHS wanted a referral it would not provide, answered, "No. I can probably get a referral (inaudible) neurological evaluation. *But I'm really not looking to go through— being put on the spot like that again.*" RP at 206 (emphasis added). Substantial evidence supports the trial court's conclusion that Ms. Bennett was the more reliable witness on the issue of the neurological evaluation services that DSHS provided and offered to the mother.

Finally, the mother does not identify what service should have been offered or provided to address the fact that her children were resisting visits with her.[9] In addition to the family therapy that had already been provided, the younger son was engaged in court ordered individual therapy (which could be expected to provide an opportunity to work through issues with his mother), and counseling was available to the older son upon request.

---

[9] "Washington courts have held that visitation is not a service for the purposes of proving RCW 13.34.180(1)(d)." *In re Welfare of K.M.M.*, 187 Wn. App. 545, 572, 349 P.3d 929 (2015), *review granted*, 184 Wn.2d 1026, 364 P.3d 119 (2016) (citing *In re Dependency of T.H.*, 139 Wn. App. 784, 791-92, 162 P.3d 1141 (2007)).

Ms. Bennett testified that while she succeeded for a time in persuading the boys to visit with the mother, "eventually it got to the point where that wasn't even working. And that's when—they just flat would not go. And we cannot force a child into a vehicle." RP at 140. Ms. Bennett even attempted to set up visits in Newport rather than Spokane, thinking that the travel might be part of the problem. But the children, who continued to engage in visitation with their father even after he defaulted in the termination proceeding, still refused visitation with their mother. Ms. Bennett testified at the trial that "I still have conversations [with the boys] about them seeing their mother every month." RP at 145.

Substantial evidence supports the trial court's finding that all services, court ordered or otherwise necessary, reasonably available, and capable of correcting the mother's parental deficiencies in the foreseeable future were expressly and understandably offered or provided.

### *Current unfitness*

"[A] parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child." *A.B.*, 168 Wn.2d at 918. To meet its burden of proof in establishing a parent is currently unfit, the State must prove by clear, cogent, and convincing evidence that the parent's deficiencies prevent him or her from providing the child with "'basic nurture, health, or safety.'" *In re*

19

*Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW 13.34.020).

While current parental unfitness is implicitly established when the department proves all

six of the statutory elements, *see K.N.J.*, 171 Wn.2d 568, the court can also explicitly

make a finding of parental unfitness—as it did in this case.

The mother argues that in light of evidence that her visitation with her boys

improved over the duration of the dependency in the eyes of the visitation supervisor and

even Ms. Bennett (though evidently not the boys themselves), the State failed to prove

she was a currently unfit parent at the time of the termination trial.

Third party perceptions of appropriate interaction in the mother's later visits with

her boys is not sufficient to establish fit parenting. Whether or not the mother and her

children were able to get along for two hours a week between the summer of 2013 and

February 2014, there was testimony from Ms. Clemons and Ms. Bennett that despite the

family therapy, the mother had never acquired the skills as an authority figure and

consistent caregiver.

The mother is correct that the court lacked current evaluations of her mental health

at the time of the termination trial. Dr. Van Wey's testimony was outdated and the work

of Dr. Smitham, Ms. Clemons, and Ms. Thomas all took place in or about 2012. But it

was the mother's fault that there were not additional and updated evaluations: she refused

later referrals. And there was testimony from the evaluators in 2009 and 2012 that the

mother's failure to participate in recommended services would likely have led to

20

deterioration in her mental state. Under these circumstances, the absence of updated evaluations hurts the mother's position; it does not help it.

Substantial evidence supports the trial court's finding that the mother was a currently unfit parent at the time of the order terminating her parental rights.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

21