IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Welfare of A.M.M.A., DOB: 10/14/11, | ) ) ) | No. 74202-7-I (Consolidated with No. 74203-5-I) |
| A minor child. | ) ) | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) ) | |
| Respondent, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| ANTONIAL MONROE, | ) ) | |
| Appellant. | ) | FILED: August 15, 2016 |

2016 AUG 15 AM 9:33 COURT OF APPEALS DIV 1 STATE OF WASHINGTON

SCHINDLER, J. — Antonial Monroe appeals the order terminating his parental rights to A.M.M.A. and denying his guardianship petition. Monroe asserts the court erred in denying his motion for a continuance and insufficient evidence supports finding a guardianship was not in the best interests of the child, the proposed guardian was not suitable, and he did not play a meaningful role in the child's life. Because the court did not abuse its discretion in denying the continuance and substantial evidence supports the challenged findings, we affirm.

Monroe is the father of A.M.M.A., born October 14, 2011. After A.M.M.A. was born, Monroe had only sporadic contact with A.M.M.A. and the mother.[1] The child's mother and A.M.M.A. lived with the maternal grandmother.

When A.M.M.A. was about six months old, Monroe was convicted of promoting prostitution in the first degree and possession of a controlled substance. Monroe has been in prison since July 2012. His early release date is April 2021.

When A.M.M.A. was about two years old, his mother's behavior became erratic. She was living "from couch to couch" and in her car. She routinely dropped A.M.M.A. off at her mother's house and then disappeared for a day or two. After she disappeared for three weeks, her mother called Child Protective Services.

The Washington State Department of Social and Health Services (Department) filed a dependency petition. The court entered an agreed dependency order on May 7, 2014. The disposition order required Monroe to participate in a psychological evaluation with a parenting component, a substance abuse evaluation, random urinalysis, a domestic violence assessment, and a parenting class. The court also authorized Monroe to have supervised visitation with A.M.M.A. in prison.

The Department placed A.M.M.A. in foster care while investigating placement with a relative. Monroe's half-brother Cortez Jackson and his partner Lorraine Lahas volunteered to care for A.M.M.A. Monroe agreed. In May 2014, the court ordered relative placement with Jackson and Lahas.

Between March 2012 and March 2014, Monroe had one visit with A.M.M.A. in prison. From October 2014 to June 2015, A.M.M.A. regularly visited Monroe in prison

---

[1] The trial court terminated the mother's parental rights to A.M.M.A. She is not a party to this appeal.

2

once or twice each month for two hours.

On January 13, 2015, the Department filed a petition to terminate parental rights to A.M.M.A. The petition identified parental deficiencies of Monroe including a history of domestic violence, substance abuse, and lack of parenting skills. The Department alleged neither parent was capable of providing an adequate, stable, and safe environment for A.M.M.A.

After the Department filed the termination petition, Monroe contacted Department social worker Natalie Judd about establishing a guardianship for A.M.M.A. and appointing his grandmother Bernice Nurse as the guardian.

The Department maintained that Nurse's 1991 conviction for domestic violence assault in the second degree disqualified her from both a guardianship and having unsupervised contact with A.M.M.A. But in May 2015, the dependency court authorized Nurse to drive A.M.M.A. to prison to visit Monroe. The dependency court and the Department made clear to Nurse that no one else could accompany her on the visits to prison with A.M.M.A. The Department advised Nurse of the prison schedule and frequency of the visits.

On June 12, Nurse was going to drive A.M.M.A. to prison for the first time. After she encountered some difficulties in complying with the prison schedule, social worker Judd left Nurse a telephone message reminding her of the required visit times.

On June 26, Nurse was scheduled to pick up A.M.M.A. from daycare at about 12:00 p.m. Nurse got lost on the way and did not arrive until 2:30 p.m. Daycare staff informed Nurse she was too late because Lahas planned to take A.M.M.A. to an appointment at 4:00 p.m.

3

Nurse called Monroe about the cancelled visit. The call was recorded.

Nurse:      . . . [Y]our grandmother is so fuckin', fuckin' pissed. It's pathetic. I drove all the way out there Tony. All the way out there . . . . I'm so mad at these mother fuckers, I don't know what to do. . . . They can't do this. . . .

Monroe:   Oh, I'm gonna kill [Lahas]. I'm gonna kill her.

Nurse:      (Unintelligible) I'll tell you to.

Monroe:   . . . I'm gonna fuck up [Jackson's] whole house. I got some hitters.

Nurse:      Hey.

Monroe:   I don't care about none of that. I don't care about none of that. He crossed the line. . . . I got some little cats that will go out there and tear that house up with them kids in it.

Monroe continued to make threats of violence against his half-brother Jackson during the call. At one point, Nurse told Monroe the problem was not with Jackson, but with Lahas.

After the call from Nurse, Monroe left a threatening message on Jackson's answering machine.

You punk ass . . . , you got this bitch tryin' to dictate my motherfuckin' son . . . when you shoulda gave my son . . . to my grandmother. . . . You can play this for the courts . . . . I'm gonna smoke you . . . . I'm gonna smoke you and that bitch . . . . Fuck you and your kids . . . . They can die with you . . . . That's how serious I am.

Monroe also called his girlfriend Brandi White and told her to assault Lahas.

You need to go and beat that bitch's [(Lahas's)] ass. That's what you need to do. . . . You need to pull that bitch by her hair, and drag her all up and down the street. You don't even need to hit the bitch. Drag her by her hair, up and down the mother fuckin' street. Make the bitch get concrete burns. . . . I want you to beat that bitch's ass, that's what I want you to go do.

Jackson told the Department about the threats and expressed fear for the safety of his family. Jackson and Lahas requested A.M.M.A. be removed from their care. Based on the nature of Monroe's threats and the potential risks, the Department placed A.M.M.A. in foster care.

On July 21, Monroe filed a guardianship petition asking the court to appoint Nurse as A.M.M.A.'s guardian. The court consolidated the guardianship petition and the petition to terminate parental rights for trial beginning September 2, 2015. A.M.M.A. was nearly 4 years old at the time.

On August 27, 2015, six days before the scheduled trial date, Monroe filed a motion to continue the termination trial and require the Department to investigate guardian placement with Nurse. Monroe noted the Office of Public Defense had completed a favorable home study but said the study was limited in scope because of the lack of access to information from the Department.

On September 1, the Department filed a motion to dismiss the guardianship petition. The Department asserted the 1991 conviction for domestic violence assault in the second degree permanently disqualified Nurse.

At the beginning of trial on September 2, Monroe renewed his motion for a two-week continuance based on late disclosure of discovery and the need for additional time to prepare for trial. The court took a recess to allow Monroe's attorney to review the discovery. Following the recess, the court denied the motion for a continuance. However, the court permitted the attorney to renew the motion at a later time if the late disclosure of evidence prejudiced Monroe.

Social worker Judd testified she worked with the Department of Corrections (DOC) counselor to determine what services were available to Monroe in prison. Judd

5

remained in regular contact with Monroe during the dependency. Monroe was able participate in parenting classes and completed a psychological evaluation. Judd testified she repeatedly told Nurse about the prison schedule and the length of visits.

Judd testified that after the Department filed the termination petition, Monroe became increasingly angry and aggressive. Judd discontinued telephone contact and communicated with Monroe only by letter.

Margaret Hobbs, Monroe's DOC classification counselor during his current incarceration and a previous incarceration, testified. Hobbs said Monroe had been in prison at various times from 1995 through 2015 and committed hundreds of infractions. During 2014 and 2015, Monroe received 23 infractions for assaulting staff, making threats, disobeying prison rules, and resisting staff orders. During 2015, Monroe committed 8 major infractions. Hobbs estimated Monroe lost approximately 300 days of good conduct time as a result of prison disciplinary proceedings.

DOC required Monroe to complete anger management courses in 2006, 2013, and 2014. Hobbs stated it was unusual to require an inmate to complete more than one anger management course. Throughout her contact with Monroe, Hobbs observed no real change in Monroe's aggressive behavior. At the time of trial, Monroe was in closed custody, the second highest custody level.

DOC correctional unit supervisor Jeffrey Flick was a counselor in the intensive management unit (IMU) in 2014 and 2015. According to Flick, inmates are placed in the IMU when they pose a risk to the general prison population. During his current incarceration, DOC placed Monroe in the IMU six times. Flick said Monroe's aggressive

behavior contributed to the risk he posed to DOC personnel and the prison population.

> Mr. Monroe does not like the word no. And when he gets bad news he misbehaves. He threatens people. He just poses a real threat to the safety of the institution, officers, and other inmates.

Monroe testified he cared for A.M.M.A. only sporadically to the extent his employment allowed after the child was born. While he was in jail for criminal charges, Monroe attempted to keep in touch with A.M.M.A. but did not ask for visits. After he was incarcerated in prison, Monroe obtained a parenting plan in July 2013 to facilitate visits with A.M.M.A. Monroe was angry when the Department intervened because he believed A.M.M.A.'s mother had been deceiving him about the condition of the child.

Monroe said he participated in all available services in order to facilitate contact with A.M.M.A. without regard to whether he thought services were necessary. During the visits, Monroe would watch movies with A.M.M.A., color, construct various items, and read stories to the child. Monroe also sent pictures and letters to A.M.M.A.

Monroe admitted he became upset with Jackson after the missed visit in June. Monroe said Jackson was "tricked into playing" the telephone recording and did not really want to stop caring for A.M.M.A. Monroe claimed he called Jackson the following day and apologized. During the call, Monroe learned Jackson had not requested the change in placement but Lahas had "made that call." Monroe testified he believed there were several other family members available to care for A.M.M.A.

The witnesses at trial agreed Monroe's visits with A.M.M.A. were positive and appropriate. According to social worker Judd, A.M.M.A. would hug Monroe and call him "daddy." Monroe was always attentive to A.M.M.A. and played with him appropriately.

Judd testified A.M.M.A. was adapting very well to his new placement and she had never seen him as playful and talkative. A.M.M.A.'s new caregivers were eager to

adopt him. Judd testified that adoption by the current caregivers and termination of Monroe's parental rights was in the best interests of A.M.M.A. Judd said A.M.M.A. was moved around considerably in the child's young life and A.M.M.A. needed a consistent, safe, and stable home. Judd testified that Monroe's "controlling behavior, his aggressiveness, his manipulative behavior would be detrimental and dangerous to this child and to whatever family has placement or adopts this child."

Guardian ad litem (GAL) Marianne Yamashita agreed termination of Monroe's parental rights was in the best interests of A.M.M.A. Yamashita acknowledged that incarcerated parents can maintain relationships with their children but stated Monroe lacked an understanding of how to meet A.M.M.A.'s developmental needs and would not be in a position to parent A.M.M.A. for many years. Yamashita noted Monroe was disruptive to relative placement and seemed "to be more focused on his own needs than those of [A.M.M.A.]." Yamashita concluded A.M.M.A.'s need for safety, stability, and permanence outweighed the child's need for a family connection.

The court found Monroe had not played a meaningful role in A.M.M.A.'s life. The court found guardianship was not in the best interests of A.M.M.A. The court denied the guardianship petition and found Nurse was not a suitable guardian. The court terminated Monroe's parental rights to A.M.M.A.

Motion to Continue

Monroe contends the court erred in denying his motion for a continuance. Monroe argues a continuance was necessary to permit the court to fully and fairly consider his guardianship petition as an alternative to termination. Monroe also maintains denial of the continuance violated his constitutional right to effective assistance of counsel and his due process right to present all relevant evidence before

8

termination of parental rights.

"[P]arents have a fundamental liberty and privacy interest in the care and custody of their children." In re Welfare of N.M., 184 Wn. App. 665, 672, 346 P.3d 762 (2014) (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). Consequently, due process "requires that parents have the ability to present all relevant evidence for the juvenile court to consider prior to terminating a parent's rights." In re Welfare of R.H., 176 Wn. App. 419, 425-26, 309 P.3d 620 (2013).

An appellate court reviews the trial court's denial of a continuance for a manifest abuse of discretion. In re Dependency of V.R.R., 134 Wn. App. 573, 580, 141 P.3d 85 (2006). We will affirm the decision " 'unless no reasonable judge would have reached the same conclusion.' " N.M., 184 Wn. App. at 673 (quoting In re Marriage of Landry, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985)). When deciding a motion to continue, the court must consider "diligence, due process, the need for an orderly procedure, the possible effect on the trial, and whether prior continuances were granted." V.R.R., 134 Wn. App. at 581.

Because termination proceedings are necessarily fact specific, denial of a continuance to explore a guardianship is not per se reversible error. N.M., 184 Wn. App. at 672. To establish that the denial of a motion to continue violates constitutional due process rights, a parent must demonstrate either prejudice from the denial or that the result of the trial would have been different if the continuance was granted. V.R.R., 134 Wn. App. at 581.

Six days before the scheduled trial, Monroe filed a motion for a two-week continuance to require the Department to investigate Nurse as a guardian for A.M.M.A. The court did not abuse its discretion in denying a two-week continuance for further

investigation of Nurse as a potential guardian. The record shows Monroe and his attorney knew for more than a year that the Department took the position that Nurse was permanently disqualified from appointment as a guardian because of her 1991 conviction.

R.H. is distinguishable. In R.H., the proposed guardian, an aunt, was identified four months before the termination trial. R.H., 176 Wn. App. at 424. The Department had completed the necessary background check and was in the process of approving the aunt for guardianship placement. R.H., 176 Wn. App. at 424. At the termination trial, the Department was optimistic about permanently placing the children with the aunt. R.H., 176 Wn. App. at 429. Under these circumstances, the denial of a timely continuance to complete the investigation of the aunt for guardianship placement violated the father's due process rights to present all material evidence prior to the termination of parental rights. R.H., 176 Wn. App. at 429.

By contrast, Monroe filed a last-minute motion for a two-week continuance to require the Department to undertake an investigation of Nurse as a potential guardian even though Monroe understood the Department's position that Nurse was permanently disqualified under its rules. In any event, although the court agreed the conviction permanently disqualified Nurse from acting as the guardian, the court also considered the guardianship petition on the merits and found Nurse was not suitable as a guardian. Under these circumstances, Monroe cannot show either prejudice from the court's denial of his untimely request for a continuance or that the result would have been different.

Monroe also argues denial of his request for a continuance violated his right to due process and effective assistance of counsel. On the first day of trial, Monroe's

attorney told the court he needed a two-week continuance to review late discovery the Department had just provided. The attorney also told the court Monroe had just identified two potential witnesses that he needed to interview. In addition, the attorney said he needed additional time with his client because DOC limited his access to Monroe before trial.

The court took a recess that lasted one and one-half hours to permit the attorney to review the discovery and contact the potential witnesses. After the recess, the attorney acknowledged he had sufficient time to review the discovery but said he still needed the continuance to prepare for trial. While claiming limited access to Monroe in the months before trial hampered his ability to prepare for trial, the attorney offered no explanation for waiting until the first day of trial to raise the issue, and acknowledged he had "a couple of substantive conversations" with Monroe. The court denied the continuance but ruled the attorney could renew the motion at any point during the trial if the late information "becomes critical . . . [or] you feel somehow it's prejudicing you."

During the course of trial, Monroe's attorney did not renew the motion for a continuance or assert he was prejudiced by the late disclosure of information or the inability to contact the two potential witnesses Monroe identified. The attorney never suggested his ability to consult with Monroe during trial was inadequate, and Monroe does not indicate how his attorney's performance was deficient during the trial.

Given the timing of the motion for continuance, the attorney's ability to review the discovery, the court's willingness to allow counsel to renew the motion should circumstances warrant, and the absence of any prejudice or indication that the attorney's performance was deficient, the court did not abuse its discretion in denying a

continuance on the first day of trial, and denial of the continuance did not violate Monroe's due process rights.

Termination of Parental Rights and Guardianship Petition

Monroe contends the trial court erred in terminating his parental rights because guardianship was an available and permanent alternative that would have allowed A.M.M.A. to maintain family ties.

When determining whether to establish a guardianship, the court considers the following statutory factors:

> (i)  The child has been found to be a dependent child under RCW 13.34.030;
> (ii)  A dispositional order has been entered pursuant to RCW 13.34.130;
> (iii)  At the time of the hearing on the guardianship petition, the child has or will have been removed from the custody of the parent for at least six consecutive months following a finding of dependency under RCW 13.34.030;
> (iv)  The services ordered under RCW 13.34.130 and 13.34.136 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided;
> (v)  There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and
> (vi)  The proposed guardian has signed a statement acknowledging the guardian's rights and responsibilities toward the child and affirming the guardian's understanding and acceptance that the guardianship is a commitment to provide care for the child until the child reaches age eighteen.

RCW 13.36.040(2)(c).

The court shall order a guardianship if the six statutory factors of RCW 13.36.040(2)(c) are established by a preponderance of the evidence and the court finds guardianship, rather than termination, is in the child's best interests.  RCW 13.36.040(2)(a); see also In re Welfare of A.W., 182 Wn.2d 689, 698-99, 344 P.3d 1186 (2015).

Before the court can terminate parental rights, the Department must first prove

the following statutory factors by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

If the Department proves the six termination factors, the court then determines by

a preponderance of the evidence whether termination is in the child's best interests.

RCW 13.34.190(1)(b); see In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104

(2010). The availability of a guardianship is evidence the court should consider when

determining whether the Department has met its burden of proving RCW 13.34.180(1)(f)

("continuation of the parent and child relationship clearly diminishes the child's

prospects for early integration into a stable and permanent home"). R.H., 176 Wn. App.

at 428-29.

Although the burden of proof is different, the first five statutory elements for

guardianship and termination are identical. See RCW 13.36.040(2)(c)(i)-(v)

(guardianship); RCW 13.34.180(1)(a)-(e) (termination). Here, the court found that

because the parties agreed the statutory elements were satisfied, "there is no need to

13

prove them and the court makes the finding that they are true."

In determining whether a guardianship is in the best interests of the child, the court considers the specific facts of each case. A.W., 182 Wn.2d at 711. Relevant factors may include:

> [T]he strength and nature of the parent and child bond, the benefit of continued contact with the parent or the extended family, the need for continued State involvement and services, and the likelihood that the child may be adopted if parental rights are terminated.

A.W., 182 Wn.2d at 712.

Substantial evidence supports the finding that guardianship was not in the best interests of A.M.M.A. The witnesses agreed Monroe was generally kind and caring and played appropriately with A.M.M.A. during the visits. The court acknowledged Monroe demonstrated "some level of bond with the child, for 1 - 2 hours at a time." But social worker Judd characterized the role Monroe played in the child's life as "minimal." For the first three years of A.M.M.A.'s life, Monroe had only sporadic contact with the child. After October 2014, Monroe had regular visits in prison but for only two hours once or twice a month. Monroe's aggressive behavior in prison resulted in numerous serious infractions, and repeated restrictions on his custody status limited his contact with A.M.M.A. and lengthened his incarceration.

Further, at the time of trial, A.M.M.A. was living in a stable foster home with caregivers approved to adopt. Both Judd and GAL Yamashita supported the adoption and the termination of Monroe's parental rights because of the safety risks resulting from his manipulative, controlling, and aggressive behavior.

Monroe contends the trial court erred in dismissing the guardianship petition and terminating his parental rights because he maintained a meaningful role in A.M.M.A.'s

life. Monroe argues the court was therefore required to consider placements that would allow him to maintain the relationship. See RCW 13.34.180(5) (when a parent is sentenced to a long-term incarceration and has maintained a meaningful role in the child's life, the Department must consider placements that allow the parent to maintain the relationship).

In 2013, the legislature amended RCW 13.34.180(1)(f) to impose additional requirements for incarcerated parents:

> If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

Laws of 2013, ch. 173, § 4.

RCW 13.34.145(5)(b) provides:

> The court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:
> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
> (ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
> (v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings,

15

and difficulty accessing lawyers and participating meaningfully in court proceedings; and

    (vi)  Whether the continued involvement of the parent in the child's life is in the child's best interest.

See generally, In re Dependency of D.L.B., No. 92448-1, 2016 WL 3912615 (Wash. July 14, 2016).

To demonstrate a meaningful role in A.M.M.A.'s life, Monroe points to evidence that he filed a parenting plan, succeeded in having A.M.M.A. placed with a family member, made every possible effort to improve his parenting skills, sent pictures and letters to A.M.M.A., and maintained loving and appropriate contact during visits.

After determining that guardianship was not in A.M.M.A.'s best interests, the court addressed whether "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). The court found Monroe's admitted expressions of love and care did not result in a meaningful relationship.

> The court considered whether or not the father maintains a meaningful role in the child's life based upon the factors in RCW 13 34 145(5)(b) and finds that the father has interacted with the child and has shown love and care, but this alone does not result in a meaningful relationship[.] The department made all reasonable efforts to reunify the child with the father, but these efforts were not successful[.] Services, including a psychological evaluation and parenting assessment, counseling, anger management treatment, were offered despite the father's incarceration[.] There were no barriers to the father[.] The father had more visits than most courts would ever allow or order and the father found a way to sabotage all of that, including missing visits because of his own misconduct in prison.

As the court's finding reflects, the evidence demonstrates that despite completion of multiple anger management courses, Monroe continued to attempt to control and manipulate A.M.M.A.'s relative placement. Although he denied he was serious, Monroe's threatening telephone calls following the missed visit in June support the

Department's concern that Monroe's conduct posed a meaningful risk to the safety of relatives who might care for A.M.M.A. Monroe's ongoing aggressive behavior in prison resulted in numerous serious infractions that limited his ability to visit A.M.M.A. and significantly lengthened his sentence. Substantial evidence supports finding Monroe did not have a meaningful role in A.M.M.A.'s life.

Proposed Guardian

Monroe contends the court erred in finding Nurse was not an appropriate guardian. Monroe maintains Nurse is experienced in caring for children, has a neat and organized home, has a strong marriage, is an active community presence, and has an extended social support system. Monroe claims Nurse's confusion about compliance with some of the Department and prison rules was understandable and did not disqualify her as a potential guardian.

Nurse testified that after the court allowed her to transport A.M.M.A. to visits with Monroe in prison, the Department never advised her of the visitation rules including the prison schedule and the length of visits. Nurse acknowledged she understood she was not supposed to allow anyone other than A.M.M.A. in the car. Nurse denied Monroe's girlfriend Brandi White was present for the June 26, 2015 visit.

Nurse testified that because Monroe respected her, he would generally do what she said. Nurse claimed she was able to "stand very tall" and "calm him down" even if Monroe was "in an uproar." Nurse claimed she was not upset after the missed June visit. The Department introduced into evidence the recordings of Monroe's calls after the June missed visit.

17

The court rejected most of Nurse's testimony as not credible.

> The court considered guardianship in lieu of termination and finds that the father's proposed guardian is not suitable[.] . . . After comparing the admitted phone recordings made following the missed visit in June, 2015 with Mrs[.] Nurse's testimony, the court concludes that Mrs[.] Nurse would say or do anything to get custody of this child and concludes that much of Mrs[.] Nurse's testimony proved to be false[.] Although Mrs[.] Nurse said that her role in her family is to "stand tall" and "take responsibility" for her actions, the phone calls showed that she did not stand tall against the father and, instead, instigated and agitated his anger[.] She also attempted to allow Brandi White, the father's girlfriend, to have an unauthorized visit with the child and father and had unapproved overnight visits with the child even though she knew these actions were not approved[.] Mrs[.] Nurse's prior conviction of Assault 2nd Domestic Violence with her spouse as the victim permanently disqualifies her from having unsupervised access to children[.] Although this Court previously waived that disqualification to allow limited contact for purposes of transporting the child to the prison for visits with the father, the court did not waive the disqualifier for placement or guardianship[.] Mrs[.] Nurse has not shown that she could be proper placement for the child and that she would not be controlled by the father[.] Mrs[.] Nurse's conduct, testimony and permanent disqualifier all prove that it would not be in this child's best interests to be placed with her.

An appellate court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." A.W., 182 Wn.2d at 711. Substantial evidence supports the court's finding that Nurse was not a suitable guardian.[2]

Monroe contends that even if he did not designate another potential guardian in his petition, the Department was required to request a continuance to investigate other

---

[2] Monroe disputes the court's conclusion that Nurse was disqualified from serving as a guardian under Department rules. Because the court addressed the guardianship petition on the merits and determined Nurse would not be a suitable guardian, we need not resolve this dispute.

potential family members for a guardianship. In particular, Monroe contends the Department should have investigated his half-sister Asia Turner who lives in Georgia.

Monroe's arguments rest primarily on RCW 13.34.180(5). RCW 13.34.180(5) provides that when an incarcerated parent has maintained a "meaningful role" in the child's life and it is in the best interests of the child, the Department should consider a permanent placement including, but not limited to, a guardianship that allows the parent to maintain a relationship with the child. For the reasons previously described, substantial evidence supports the court's finding that Monroe did not maintain a meaningful role in A.M.M.A.'s life.

We affirm the order denying the guardianship petition and the order terminating parental rights to A.M.M.A.

WE CONCUR: